No. 14-2249

# In the United States Court of Appeals for the First Circuit

RUSSELL JARVIS; JAMES JARVIS; ROBERT CRAMPTON; AND
COMMONWEALTH SECOND AMENDMENT, INC.,

*Plaintiffs-Appellants*,

*v*.

VILLAGE GUN SHOP, INC. D/B/A VILLAGE VAULT,

*Defendant-Appellee*.

Appeal from a Decision of the United States District Court for the
District of Massachusetts, District Court No. 1:12-cv-40032

### APPELLANTS' BRIEF

Patrick M. Groulx
Grollman, LLP
321 Columbus Avenue
Boston, Massachusetts 02116
(617) 859-8966 tel
(617) 859-8903 fax
*patrick@grollmanllp.com*

David D. Jensen
DAVID JENSEN PLLC
111 John Street, Suite 420
New York, New York 10038
(212) 380-6615 tel
(917) 591-1318 fax
*david@djensenpllc.com*

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Commonwealth Second Amendment, Inc. has no parent corporation, and no publicly held corporation owns its stock.

# TABLE OF CONTENTS

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...........................................................1

JURISDICTIONAL STATEMENT .......................................................................................1

STATEMENT OF THE ISSUES ..........................................................................................1

STATEMENT OF THE CASE .............................................................................................2

STATEMENT OF FACTS ...................................................................................................3

    1.  *State Law Authorizes Police to Seize Guns, But Requires Police to Hold them for a One Year Period* ............................................................3

    2.  *A 1998 Amendment Authorizes Police to Transfer Guns to Private Companies that can Impose Fees on Owners – Without Prior Notice*...........4

    3.  *Village Vault Imposed Fees and a Lien on the Plaintiffs – Without Any Prior Notice* ..........................................................................................6

    4.  *By the Time of Defendant's Notice, Plaintiffs had Already Lost Much of the Value of Their Property – and they Ultimately Lost All of it* ...............8

    5.  *District Court Proceedings*...............................................................................9

SUMMARY OF ARGUMENT .............................................................................................10

ARGUMENT ....................................................................................................................11

I.  DEFENDANT IS A STATE ACTOR .........................................................................11

    A. *The Issue is Defendant's Unilateral Imposition of Fees and a Lien* .............12

    B. *Defendant's Actions have a Close Nexus to and Interplay with the Actions and Obligations of the Police* ..........................................................14

    C. *Cases Addressing Vehicle Impound and Storage Point to the Conclusion of State Action* ..........................................................................16

II. PLAINTIFFS ESTABLISHED PARTIAL SUMMARY JUDGMENT...................................19

    A. *Defendant Deprived the Plaintiffs of Property Interests*..............................20

B. *Plaintiffs Received Neither Prior Notice nor an Opportunity to be Heard* ....................................................................................22

C. *Plaintiffs are Entitled to a Declaratory Judgment* .......................................24

D. *Plaintiffs are Entitled to Money Damages* ...................................................26

CONCLUSION ........................................................................................................27

CERTIFICATE OF COMPLIANCE .................................................................................28

CERTIFICATE OF SERVICE .........................................................................................29

ADDENDUM ..........................................................................................................30

# TABLE OF AUTHORITIES

## CASES

Addante v. Village of Elmwood Park, 541 F. Supp. 497 (N.D. Ill. 1982) ..............18

Aetna Life Ins. Co. v. Haworth, 300 U.S. 227 (1937)..............................................25

Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40 (1999) .......................................12

Amsden v. Moran, 904 F.2d 748 (1st Cir. 1990)......................................................26

Arnold v. Delano, 58 Mass. 33 (1849) .....................................................................20

Assocs. Comm'l Corp. v. Wood, 22 F. Supp. 2d 502 (D. Md. 1998) ........ 19, 22, 25

Bd. of Regents v. Roth, 408 U.S. 564 (1972)...........................................................23

Belcher v. Norton, 497 F.3d 742 (7th Cir. 2007).....................................................22

Blum v. Yaretsky, 457 U.S. 991 (1982) ...................................................................12

Boston v. Rockland Tr. Co., 460 N.E.2d 1269, 391 Mass. 48 (1984).....................20

Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,
    531 U.S. 288 (2001)...................................................................................... 14-16

Burton v. Wilmington Parking Auth., 365 U.S. 715 (1961)....................................12

Carey v. Piphus, 435 U.S. 247 (1978) .....................................................................26

Craig v. Carson, 449 F. Supp. 385 (M.D. Fla. 1978) ................................... 21, 23-24

Dorpan, S.L. v. Hotel Meliá, Inc., 728 F.3d 55 (1st Cir. 2013).............................11

Draper v. Coombs, 792 F.2d 915 (9th Cir. 1986).....................................................25

Edmonson v. Leesville Concrete Co., 500 U.S. 614 (1991)....................................12

Estades-Negroni v. CPC Hosp. San Juan Capestrano,
    412 F.3d 1 (1st Cir. 2005).................................................................................12

Flagg Bros., Inc. v. Brooks, 436 U.S. 149 (1978) ...................................................13

Ginorio v. Contreras, 409 F. Supp. 2d 101 (D.P.R. 2006) ......................................26

Graff v. Nicholl, 370 F. Supp. 974 (N.D. Ill. 1974) ......................................... 23, 25

Hale v. Tyree, 491 F. Supp. 622 (E.D. Tenn. 1979)................................................25

Hann v. Carson, 462 F. Supp. 854 (M.D. Fla. 1978)........................................ 18, 23

Hightower v. Boston, 693 F.3d 61 (1st Cir. 2012) ...................................................13

Jackson v. Metro. Edison Co., 419 U.S. 345 (1974) ...............................15

Lawrence v. Reed, 406 F.3d 1224 (10th Cir. 2005) ...............................26

Liberty Mut. Ins. Co. v. Market St. Garage & Towing Serv., Inc.,
    307 N.E.2d 858 (Mass. App. Ct. 1974) .................................20

Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982) ......................... 12, 14

Maguire v. Old Orchard Beach, 783 F. Supp. 1475 (D. Me. 1992) .......................26

Matthews v. Eldridge, 424 U.S. 319 (1976) ...............................19

Mays v. Scranton City Police Dep't, 503 F. Supp. 1255
    (M.D. Penn. 1980) ................................................ 19, 21, 24

Messere v. Fair, 752 F. Supp. 48 (D. Mass. 1990) ...............................27

Miller v. City of Chicago, no. 82 C 1607, 1983 U.S. Dist.
    LEXIS 11520 (N.D. Ill. Nov. 18, 1983) .................................25

Perkins v. Londonberry Basketball Club, 196 F.3d 13 (1st Cir. 1999) ............. 13-14

Propert v. District of Columbia, 948 F.2d 1327 (D.C. Cir. 1991).............. 22, 25-26

Remm v. Landrieu, 418 F. Supp. 542 (E.D. La. 1976)..................................... 21, 23

Sandia v. Rivera, 46 P.3d 108, 132 N.M. 201 (2002) .................................21

Smith v. Insley's Inc., 499 F.3d 875 (8th Cir. 2007).................................17

Stypmann v. City and County of San Francisco, 557 F.2d 1338 (9th Cir. 1977) ...16

Sutton v. City of Milwaukee, 521 F. Supp. 733 (E.D. Wis. 1981).........................23

Tedeschi v. Blackwood, 410 F. Supp. 34 (D. Conn. 1976) ....................... 16, 19, 25

United States v. Daccarett, 6 F.3d 37 (2d Cir. 1993)................................21

Verdi v. City of Philadelphia, 553 F. Supp. 334 (E.D. Penn. 1982) ......................19

Weinrauch v. Park City, 635 F. Supp. 91 (D. Utah 1988)......................................19

West v. Atkins, 487 U.S. 42 (1988).......................................................15

Wright v. City of Reno, 533 F. Supp. 58 (D. Nev. 1981)........................... 19, 21, 24

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XIV ........................................................20

## STATUTES

28 U.S.C. § 1291 ................................................................1

28 U.S.C. § 1331 .................................................................................1

28 U.S.C. § 1343 .................................................................................1

28 U.S.C. § 2201 ............................................................................ 1, 24

28 U.S.C. § 2202 .................................................................................1

42 U.S.C. § 1983 .................................................................................1

1968 Mass. Acts. ch. 737 ....................................................................4

1998 Mass. Acts ch. 180 ..................................................................4, 7

M.G.L. c. 140, § 129C ........................................................................5

M.G.L. c. 140, § 129D ................................................................. *passim*

M.G.L. c. 209A, § 3B .........................................................................3

## REGULATIONS

1086 Mass. Reg. 56 (Sept. 7, 2007) ...................................................5

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Oral argument will be particularly beneficial here because the key legal issue (state action) turns on a close review of the specific facts and circumstances presented.  Oral argument will assist the Court in addressing these facts and circumstances and presenting pertinent questions and issues to counsel.

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellants ("Plaintiffs") seek money damages and declaratory and injunctive relief to redress violations of their Fourteenth Amendment right to procedural due process.  42 U.S.C. § 1983.  The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

The District Court issued a memorandum decision and order on October 15, 2014 that denied Plaintiffs' motion for partial summary judgment and granted summary judgment to Defendant-Appellee ("Defendant") *sua sponte*.  Add. 23-24. Pursuant to a stipulation, the District Court entered final judgment on November 24, 2014.  Add. 25.  Plaintiffs timely filed a notice of appeal on November 26, 2014.  App. 112.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1)    Is Defendant liable as a state actor?

2)    Did Plaintiffs establish entitlement to partial summary judgment?

-1-

## STATEMENT OF THE CASE

Defendant stores guns and ammunition at the request of police departments that have themselves taken custody of the items from their owners. Massachusetts law requires police departments to store such guns for a period of one year, without charge, and to allow the owner to redeem the property (if lawful), or alternatively, to transfer it to an eligible third party. Police departments can avoid this statutory obligation if they choose to transfer guns to a licensed gun dealer, which then stores the property as a "bonded warehouse."

Massachusetts law gives this dealer statutory powers that police departments do not have: to impose fees on the owner for storage of the property; to withhold the property from its owner until he or she has paid the fees; and ultimately, to take and sell the property if the owner fails to pay. The statute does not provide for any notice in advance of these additional deprivations, nor does the statute provide for an opportunity to be heard regarding the propriety of the gun dealer's actions.

Defendant is a licensed gun dealer that provides bonded warehouse services. Police departments took custody of the guns and other property of the Plaintiffs, and those police departments then turned that property over to the custody of Defendant. Immediately upon taking custody of the property, Defendant began charging fees, and it refused to allow the Plaintiffs to redeem or transfer their property without paying those fees. Defendant set its fees and terms unilaterally,

not as the product of any sort of voluntary or agreed contractual relationship. None of the Plaintiffs had any prior notice that they would become liable for Defendant's fees, nor that they could lose title to their property if they did not pay them. Rather, the Plaintiffs were "stuck" with the fees that Defendant chose to impose, which the Plaintiffs found out about only after Defendant had imposed them. Defendant's fees were substantial – and indeed prohibitive, for by the time Plaintiffs received notice of Defendant's involvement, they had already lost a large part of the value of their property. Basic procedural due process protections would have avoided these deprivations.

### STATEMENT OF FACTS

1. *State Law Authorizes Police to Seize Guns, But Requires Police to Hold them for a One Year Period*

Under certain circumstances, Massachusetts law authorizes police officers to seize and hold privately owned guns and ammunition[1] from individuals who can no longer actively "possess" them. For example, police can seize guns when a person's firearms license has expired or been denied or revoked, see M.G.L. c. 140, §§ 129B, 129D (reproduced at Add. 26-27), or when a person becomes subject to a restraining order, see id. c. 209A, § 3B. Under these circumstances, §

---

[1] The statute authorizes police to seize "firearms, rifles, shotguns and machine guns and ammunition." M.G.L. c. 140, § 129D. Plaintiffs refer to all such items as "guns" or "firearms," unless the context indicates otherwise.

129D of Chapter 140 of the Massachusetts General Laws requires police to hold the guns and ammunition for a period of one year.  See id. c. 140, § 129D.  During this period, the owner has the statutory "right" to transfer his or her property to any other person who is qualified to possess it, or to redeem the property if he or she has become eligible to do so.  See id.  Massachusetts law has included this one-year redemption right since 1968, when it first adopted universal gun-owner licensing and authorized police to seize firearms and ammunition from people without valid licenses.  See 1968 Mass. Acts. ch. 737, sec. 7, § 129D.

2.  *A 1998 Amendment Authorizes Police to Transfer Guns to Private Companies that can Impose Fees on Owners – Without Prior Notice*

The General Court amended § 129D in 1998 to allow police agencies to transfer seized firearms and ammunition to licensed gun dealers that operate "bonded warehouses."  See 1998 Mass. Acts ch. 180, sec. 36.  Defendant is a licensed gun dealer that operates a "bonded warehouse" in Northborough, Massachusetts.  App. 17, 31, 50, 109.

The statutory requirements of a "bonded warehouse" are:  (1) federal and state licensure as a gun dealer; and (2) "a safe for the secure storage of firearms and a weapon box or similar container for the secure storage of other weapons and ammunition."  M.G.L. c. 140, § 129D.[2]  Like the police, a bonded warehouse has

---

[2] There is no requirement that a "bonded warehouse" have a bond, nor is there any directive regarding what risks or losses any such bond would need to cover.

-4-

the statutory obligation to ensure that any transfer of a gun will not result in the original owner coming into unlawful possession.  See id. (requiring both police departments and bonded warehouses to "affirm in writing that the purchaser or transferee shall not in violation of section 129C transfer the firearms, rifles, shotguns or machine guns or ammunition to the former owner").

However, unlike the police, a bonded warehouse acquires statutory fee and lien powers when it takes custody of guns and ammunition.  First, the bonded warehouse acquires the right to impose "reasonable storage charges" on the owner.  See id.  And second, the bonded warehouse acquires the ability to sell the property if its fees are unpaid for 90 days.  See id.

Section 129D requires a bonded warehouse to "inspect" the property it takes into its custody and to "issue to the owner a receipt indicating the make, model, caliber, serial number and condition of each weapon so received."  Id.  The statute does not specify a time limit for providing this receipt, nor does it require any other notice or provide for any right to a hearing.  See id.  Although the statute authorizes the Executive Office of Public Safety and Security to adopt regulations, see id., no regulations have ever been adopted, see 1086 Mass. Reg. 56 (Sept. 7, 2007).

-5-

3. *Village Vault Imposed Fees and a Lien on the Plaintiffs – Without Any Prior Notice*

Police officials seized guns and other property from each of the individual Plaintiffs – Russell Jarvis, James Jarvis, and Robert Crampton – and these officials then turned the items over to the custody of Defendant. App. 20, 22, 33-34, 47-48, 60-62, 80-81, 100-01, 108-09. Defendant sent notices to each individual, but only *after* it had taken custody of their property and imposed fees. App. 20-22, 33-34, 51-52, 61-62, 81, 100-01, 109. Each individual Plaintiff could not afford to pay Defendant's fees, which had already depleted much of the value of their property, and as a result, Defendant took and sold the property to pay those fees. App. 21-23, 33-34, 54-55, 63, 82-83, 101-02, 110.

Specifically, Massachusetts State Police took custody of guns and other property from the home of James Jarvis on July 9, 2010, after his ex-wife obtained an *ex parte* order of protection against him. App. 46-48, 60, 80, 108-09. James, his father Russell, and his adult son James, Jr. (not a party) owned these guns and other items, many of which were family heirlooms. App. 47-48, 60-61, 80-81, 107-09. In addition, the officers took custody of several items (such as cases, scopes, air guns, and primitive or antique guns) that were not guns or ammunition subject to § 129D in the first place. App. 47-48, 60-61, 80-81, 107-09.

State Police transferred custody of the Jarvises' guns and other property to Defendant on August 11, 2010. App. 50, 61-62, 81, 109. Defendant took custody

of these items and assessed fees – and it then provided the Jarvises their first notice that they would need to pay those fees if they wished to retain title to their property. App. 50-51, 62, 81, 109. According to Defendant's records, the Jarvises first received this letter on August 18, 2010, seven days after Defendant had taken custody of their property and begun imposing fees. App. 51, 61, 81, 109.

In the case of Robert Crampton, Tewksbury Police took custody of two shotguns and a revolver on June 2, 2010, after Mr. Crampton contacted them to report an apparent theft from his home. App. 49-50, 100, 109. Mr. Crampton is a World War II veteran, and he carried the revolver (his own pre-war purchase) while serving the United States in the European theater. App. 49, 99, 109. Mr. Crampton held a Massachusetts Firearms Identification card ("FID") that stated it had an "Indefinite" expiration date. App. 49, 100, 109. However, unbeknownst to Mr. Crampton (who was living in Florida at the pertinent time), the General Court had amended Massachusetts law to eliminate indefinite licenses in 1998. App. 50, 100, 109; see also 1998 Mass. Acts ch. 180, sec. 73. As a result, and contrary to Mr. Crampton's understanding, he did not have a valid license when he later moved back to Massachusetts. App. 50, 100, 109. As in the case of the Jarvises, Tewksbury Police took custody of not just his guns and ammunition, but also of other items (such as cases and scopes) that were not within § 129D's purview in the first place. App. 50, 100, 109.

-7-

State Police transferred Mr. Crampton's guns and other property to
Defendant on November 15, 2010.  App. 51, 100-01, 109.  As with the Jarvises,
the first notice that Mr. Crampton received was Defendant's after-the-fact letter,
notifying him that he would need to pay its fees in order to keep title to his
property.  App. 51-52, 101, 109-10.  According to Defendant's records, Mr.
Crampton received this letter on November 18, 2010.  App. 52, 100-01, 110.

4.  *By the Time of Defendant's Notice, Plaintiffs had Already Lost Much of*
*the Value of Their Property – and they Ultimately Lost All of it*

On the day that James and Russell Jarvis first received notice that Defendant
had taken custody of their property and imposed fees on them, the amount they
would have needed to pay to transfer the property to another party – such as a
friend or relative, or a gun dealer of their choosing – was $1,231.  App. 53, 62-63,
82, 110.  The Jarvises could not pay these fees, and as a result, Defendant later
auctioned these guns for the sum of $2,695.  App. 54-55, 63, 83, 110.  Thus, from
the moment the Jarvises first learned of Defendant's involvement, they had *already*
lost 46% of the value that Defendant would ultimately derive by selling that
property at auction.  Almost half of their property had already been lost.

Similarly, at the moment of Robert Crampton's first notice, he would have
needed to pay $156 in order to obtain the return or transfer of his property – which
was 84% of the value ($185) that Defendant ultimately derived when it auctioned
his property.  App. 53-55, 101-02, 110.  So again, by the time of the first notice, he

had already lost much of the value of his property, and the process by which he would later lose title to the property was already in motion.

Prior notice would have avoided these deprivations. Each of the Plaintiffs testified that they would have made alternative arrangements for the storage of their guns – with a friend or relative, or a gun store of their choosing – if Defendant had provided them with prior notice that it intended to charge them fees. App. 51-52, 62, 81, 101, 109. Moreover, Plaintiffs James and Russell Jarvis actually located two other licensed gun dealers that were willing to store their property for significantly less than Defendant charged them, but Defendant's fees were already so high that the options were not viable. App. 54, 61, 82-83, 110. By the time the Plaintiffs received notice, it was already to late to avoid the deprivation.

5. *District Court Proceedings*

Plaintiffs filed suit on March 27, 2012 against Defendant, and also against the Secretary of the Executive Office of Public Safety and Security ("EOPSS"), the agency with statutory authority to regulate "bonded warehouses." App. 1, 18. At the first court conference Senior District Judge Joseph L. Tauro directed the EOPSS Secretary to "consider the claims raised by Plaintiffs' Complaint and propose appropriate relief if the Executive Office determines that a remedy is required," and the court stayed discovery pending a response from the agency.

App. 5, 40-41. EOPSS filed three reports over the next 12 months, but it never proposed any regulations. App. 5. Finally, on October 14, 2013, Plaintiffs moved for partial summary judgment that Defendant had deprived them of their property rights without due process of law. App. 5-6, 42. Judge Tauro allowed Defendant and EOPSS to take discovery and postponed the time for responding to Plaintiffs' motion until this discovery was complete. App. 6-8.

District Judge William G. Young began presiding over matters in the case in May 2014, although the case still remained assigned to Judge Tauro. App. 9. On October 15, 2014 Judge Young issued a decision and order that denied Plaintiffs' motion and granted Defendant summary judgment *sua sponte*. Add. 23-24; App. 10. The Clerk then reassigned the case from Judge Tauro to District Judge Leo T. Sorokin. App. 10-11. On November 24, 2014, pursuant to a stipulation, Judge Sorokin dismissed Plaintiffs' claims against EOPSS and entered final judgment. Add. 25; App. 11. Plaintiffs then filed their notice of appeal. App. 11, 112.

## SUMMARY OF ARGUMENT

Defendant is liable as a state actor because the deprivations it imposed had a direct nexus to and interplay with the actions of the police, and the obligations that thereby resulted for the police. The factual predicate to Defendant's deprivations was the seizure of firearms by the police – which is indisputably state action. And

Plaintiffs became liable to Defendant's unilaterally imposed fees and terms precisely because the police had taken physical custody of their property. Absent this action, Defendant would not have been in a position to take custody of the Plaintiffs' property and then unilaterally impose a contract on the Plaintiffs.

Moreover, Defendant's custody of the guns served to relieve the police of an obligation that Massachusetts law otherwise imposed on them: to hold the guns for a period of one year. By taking custody of the Plaintiffs' property and then imposing the fees and lien at issue in this case, Defendant relieved the police of obligations they otherwise would have owed to the Plaintiffs.

Plaintiffs accordingly established entitlement to partial summary judgment. Defendant deprived the Plaintiffs of substantial property interests without the basic procedural protections – notice and an opportunity to be heard – that the Due Process Clause requires.

## ARGUMENT

The standard of review is de novo, with all inference drawn in favor of the Plaintiffs. Dorpan, S.L. v. Hotel Meliá, Inc., 728 F.3d 55, 60-61 (1st Cir. 2013).

## I.    DEFENDANT IS A STATE ACTOR

The right to procedural due process would be illusory if government officials could evade it merely by asking a private person to perform functions that would

otherwise be their responsibility.  Thus, the Supreme Court has long recognized that in various circumstances constitutional protections must apply to the actions of private companies.  See, e.g., Burton v. Wilmington Parking Auth., 365 U.S. 715, 725-26 (1961) (Fourteenth Amendment applied to coffee shop operating in municipal parking garage).  This Court has recognized three basic grounds for holding private companies liable:  (1) the state compulsion test; (2) nexus/joint action test; and (3) the public function test.  See Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 5 (1st Cir. 2005).  The considerations surrounding the nexus/joint action test are the ones most pertinent here.  Plaintiffs focus on this issue.

Defendant indisputably acted pursuant to a state law (M.G.L. c. 140, § 129D), and thus, the operative state action question is simply that of "fair attribution" – whether Defendant "may fairly be said to be a state actor." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982); see also Edmonson v. Leesville Concrete Co., 500 U.S. 614, 621 (1991).

A. *The Issue is Defendant's Unilateral Imposition of Fees and a Lien*

This question of fair attribution "begins by identifying 'the specific conduct of which the plaintiff complains'" and examining whether that conduct "may be fairly attributable to the State." See Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 51 (1999) (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)); see also

-12-

Perkins v. Londonberry Basketball Club, 196 F.3d 13, 19-20 (1st Cir. 1999).  The conduct at issue here is Defendant's act of imposing fees and a lien on the Plaintiffs, without their prior knowledge or consent, and then ultimately taking title to their property to pay those fees.  Defendant is the party that chose to impose these fees, as well as their amount and terms, and it was Defendant that then took the property to pay the fees it had imposed – but Defendant could not have done this had the police not taken the property from the Plaintiffs in the first place.

It is important to clarify two things that are *not* at issue in this case.  First, this case does not concern whether (or under what circumstances) police officers can take custody of guns without providing pre-deprivation protections.  Cf. Hightower v. Boston, 693 F.3d 61, 84-85 (1st Cir. 2012) (police could revoke gun license without providing pre-deprivation process).  Rather, the police officials here had already taken custody of the Plaintiffs' property.  What changed was that the Plaintiffs became liable to pay Defendant's fees, on pain of losing the title they continued to hold after this initial deprivation of custody.

This case also does not concern the situation in which a private company has stored property in consequence of government action – but where the company has notified the owner of the proposed arrangement in advance, and the owner has assented to the terms.  Cf. Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 153 (1978) (evicted plaintiff "was informed of the cost of moving and storage, and she

instructed the workmen to proceed"). Instead, the Defendant in this case imposed its terms on the Plaintiffs unilaterally. And Defendant was only able to do this because police had taken custody of the property first, and had then permitted Defendant to take it.

B. *Defendant's Actions have a Close Nexus to and Interplay with the Actions and Obligations of the Police*

While none of the "host of factors" that govern the "normative judgment" of fair attribution applies "across the board," taken as a whole the analytic factors of significance show state action here. See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295-96 (2001).

First and foremost is the fact that Defendant's actions "result[ed] from the State's exercise of 'coercive power,' . . . [and] the State provide[d] 'significant encouragement, either overt or covert.'" Id. at 296 (quoting Blum, 457 U.S. at 1004); see also Lugar, 457 U.S. at 937 (whether the defendant "has acted together with or has obtained significant aid from state officials") ; Perkins, 196 F.3d at 19. Here, it was police action that both led to and facilitated the actions that injured the Plaintiffs – for while it was Defendant that unilaterally imposed its terms on the Plaintiffs, Defendant could not have done so in the absence of police taking custody of the Plaintiffs' property. Moreover, Defendant was only able to take custody of the Plaintiffs' property – and then, as a result, force its fees and terms upon the Plaintiffs – because police offered Defendant the opportunity to do so.

-14-

There is a "close nexus between the State and the challenged action." Jackson v. Metro. Edison Co., 419 U.S. 345, 351 (1974).

Further compelling the conclusion of fair attribution is the fact that Defendant was performing duties that the police would otherwise have been obligated to perform themselves. See Brentwood Acad., 531 U.S. at 296 (additional factors are willful participation in joint activity with state agents and delegation of a public function); see also West v. Atkins, 487 U.S. 42, 56 (1988) ("The State bore an affirmative obligation to provide adequate medical care to West; the State delegated that function to respondent Atkins; and respondent voluntarily assumed that obligation by contract."). Massachusetts law *required* the police departments that took custody of the Plaintiffs' property to hold that property for one year, and it likewise required them to transfer the guns and other items to an eligible third party at the Plaintiffs' demand – all without fee. See M.G.L. c. 140, § 129D.[3] And even after the transfer, Defendant had the same obligation that the police had to ensure that any subsequent transfer protected the state's interest in withholding possession from the person who lacked a valid license. Defendant relieved the police agencies of these statutory obligations by taking custody of the Plaintiffs' property – and doing so facilitated the detrimental actions that Defendant then took.

---

[3] Notably, while police can auction guns left for more than one year, the proceeds go to the state treasury, not the police department. See M.G.L. c. 140, § 129D.

C. *Cases Addressing Vehicle Impound and Storage Point to the Conclusion of State Action*

The question of fair attribution, in particular, is one for which "examples may be the best teachers." Brentwood Acad., 531 U.S. at 296. Particularly pertinent examples can be found in cases dealing with private companies that store motor vehicles at the request of police officials – and a substantial body of case law holds these private companies liable in situations analogous to those presented here.

For example, in Stypmann v. City and County of San Francisco, 557 F.2d 1338 (9th Cir. 1977), the Court of Appeals for the Ninth Circuit had little difficulty concluding that a company that towed and stored cars at the request of police officers, and then asserted a statutory lien for its services, was liable as a state actor. Id. at 1341-42. The court looked to the role of the police in requesting the tow, designating the garage, and notifying the owner, and also to the fact that the towing and storage "scheme [was] designed solely to accomplish the state's purpose of enforcing its traffic laws." Id. at 1341. Those considerations apply equally here: police officers interacted with the Plaintiffs, took custody of their guns, and then decided whether and where the guns would be transferred. And just as it serves the state's interest in enforcing its traffic laws to take custody of vehicles that lack valid registrations, see Tedeschi v. Blackwood, 410 F. Supp. 34, 443 (D. Conn. 1976) (three-judge court), so too it serves the state's interest in

-16-

enforcing its gun laws to withhold guns from those who lack valid gun licenses. The Ninth Circuit ruled that the company was "a willful participant in a joint activity with the State or its agents, and there is a sufficiently close nexus between the State and the challenged action of the towing company so that the action of the latter may be fairly treated as that of the State itself." <u>Stypmann</u>, 557 F.2d at 1341-42 (quotations and citations omitted).

Similarly, the Courts of Appeals for the Eighth and Tenth Circuits have both held that companies that tow and store vehicles at the request of police officers are state actors with regard to deprivations that attend those storage services. <u>See</u> <u>Smith v. Insley's Inc.</u>, 499 F.3d 875, 880 (8th Cir. 2007); <u>Coleman v. Turpen</u>, 697 F.2d 1341, 1345 (10th Cir. 1982) ("Kiefer jointly participated in seizing the truck by towing it away."). In addition, the Eighth Circuit rejected the towing company's claim that at some point following the initial seizure it had ceased to be a state actor with regard to its ongoing storage services. <u>See</u> <u>Smith</u>, 499 F.3d at 880 ("The entire time that Insley's stored Smith's truck, and later sold it, was as a result of the initial criminal investigation tow.").

Various decisions from federal district courts are also in accord – that companies are state actors when they tow and store cars at the request of government officials and then assert fees or liens pursuant to a statutory power. For example, in <u>Addante v. Village of Elmwood Park</u>, 541 F. Supp. 497 (N.D. Ill.

-17-

1982), the court held a private towing company liable as a state actor when it had towed a vehicle at the request of police officers and had then asserted a right to recover fees from the owner under a statute that did not provide for any right to be heard.  See id. at 498-99.  The towing company was a state actor  because its "act of towing was an integral part of—and a causal factor in—the alleged due process violation."  Id. at 499.  The towing company that imposed the fees was the liable party because "[d]ue process liability must be viewed in causation terms," even if some other party (like the police) might have been "best equipped to remedy the violation."  Id. at 498.  As the court observed, no one "forces the tower to accept the economic benefits the Ordinance makes available to it," and the towing company could "simply refuse to tow a vehicle if due process has not been accorded the owner."  Id.  Thus, "there is no unfairness in requiring it to bear the burdens together with the benefits of the Ordinance."  Id. at 498.

Another instructive district court decision is Hann v. Carson, 462 F. Supp. 854 (M.D. Fla. 1978), where a towing company that towed and stored a vehicle at the request of police officers refused to release the vehicle to the owner unless he paid the fees it had imposed.  See id. at 858.  The court ruled there was "no serious doubt that, in depriving plaintiff of his car, otherwise nominally private activity of [the towing company] has become state action as a result of its relationship with, and participation in, the state-authorized conduct of" the police officers.  Id. at 869.

A number of other federal district courts have likewise held towing and storage companies liable in circumstances that are essentially analogous to those at bar.  See Assocs. Comm'l Corp. v. Wood, 22 F. Supp. 2d 502, 506 n.6 (D. Md. 1998); Weinrauch v. Park City, 635 F. Supp. 91, 94 (D. Utah 1988) ("a person who impounds vehicles for a municipality is a state actor"); Wright v. City of Reno, 533 F. Supp. 58, 63 (D. Nev. 1981); Mays v. Scranton City Police Dep't, 503 F. Supp. 1255, 1263-64 (M.D. Penn. 1980); Tedeschi, 410 F. Supp. at 41-42 ("Meaningful participation by a state agent, pursuant to a state statute, in the deprivation of a person's property by another private person unquestionably brings the entire transaction 'under color of state law.'"); see also Verdi v. City of Philadelphia, 553 F. Supp. 334, 336-37 (E.D. Penn. 1982) (private company that demolished a building pursuant to a government contract was a state actor).


## II.    PLAINTIFFS ESTABLISHED PARTIAL SUMMARY JUDGMENT

There is little question that Plaintiffs are otherwise entitled to partial summary judgment holding Defendant liable, as it was Defendant who deprived the Plaintiffs of property interests without either adequate notice or an opportunity to be heard.  See generally Matthews v. Eldridge, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (quotation omitted)).

A. *Defendant Deprived the Plaintiffs of Property Interests*

The Fourteenth Amendment's Due Process Clause requires "due process of law" before states and their actors deprive people of "property" interests.  U.S. Const. amend. XIV.  In this case, there were two successive deprivations of property.

The first occurred when the Plaintiffs suddenly became liable to pay Defendant's storage charges.  The Plaintiffs did not have this obligation before Defendant took custody of their property and chose to immediately begin imposing fees.  At the same time, Defendant also acquired a lien[4] in the property, as § 129D authorized it to retain and ultimately sell the property if the Plaintiffs did not pay its storage charges.  See M.G.L. c. 140, § 129D.  This was a material change in the status quo, as Massachusetts law would not otherwise have allowed a company like Defendant to impose fees and liens against property owners with whom it had made no contract.  See Liberty Mut. Ins. Co. v. Market St. Garage & Towing Serv., Inc., 307 N.E.2d 858, 858-59 (Mass. App. Ct. 1974).

Courts addressing vehicle storage and impoundment charges have been uniform in concluding that the obligation to pay charges, and the concomitant

---

[4] While § 129D does not use the term "lien," its authorization to sell property to satisfy fees implies the power to retain custody of property for that purpose – which is the definition of a lien.  See Boston v. Rockland Tr. Co., 460 N.E.2d 1269, 1273, 391 Mass. 48, 55 (1984) ("The very definition of a lien is, a right to hold goods, the property of another, in security for some debt, duty or other obligation."  (quoting Arnold v. Delano, 58 Mass. 33, 38 (1849))).

power to lien those charges against vehicles, is an independent deprivation of "property."  For example, the Supreme Court of New Mexico concluded that a requirement to pay a fee in order to obtain the release of a vehicle "implicat[es] the right to due process no less than the initial towing" of the vehicle.  See Sandia v. Rivera, 46 P.3d 108, 110, 132 N.M. 201, 203 (2002).  One federal district court characterized "the assessment of towing fees and storage charges" as a "depriv[ation] of a significant property interest."  Remm v. Landrieu, 418 F. Supp. 542, 548 (E.D. La. 1976); see also Mays, 503 F. Supp. at 1262 ("towing and assertion of a de facto lien for towing and storage charges subjects an automobile owner to a significant deprivation").  Another district court observed that even if the towing or detention of a vehicle alone did not constitute a deprivation, still "the failure to afford a hearing prior to imposing a lien for storage costs in favor of the towing company is [a] constitutional violation."  Wright, 533 F. Supp. at 64; see also Craig v. Carson, 449 F. Supp. 385, 392 (M.D. Fla. 1978) (plaintiffs "have two interests at stake in these ordinances:  the impounded cars and the required charges").

Defendant also deprived Plaintiffs of Fourteenth Amendment "property" when it auctioned their guns and other times to pay its fees.  See United States v. Daccarett, 6 F.3d 37, 46 (2d Cir. 1993) ("seizure and forfeiture are two distinct events").  In the motor vehicle context, courts have uniformly found that the

-21-

complete taking of a vehicle – whether by destruction or by sale to a third-party – is a deprivation of protected property interests.  See Propert v. District of Columbia, 948 F.2d 1327, 1331 (D.C. Cir. 1991) (destruction of motor vehicle was deprivation); Coleman, 697 F.2d at 1344-45 (auction of vehicle and other property to third-party); Assocs. Comm'l, 22 F. Supp. 2d at 505 (sale to third party that divested plaintiff of title by operation of state law).  Of course, a lien for towing and storage services "d[oes] not eliminate" a person's property interest, and due process requirements continue to apply to the conclusive taking of property subject to a lien.  See Belcher v. Norton, 497 F.3d 742, 750 (7th Cir. 2007).

B. *Plaintiffs Received Neither Prior Notice nor an Opportunity to be Heard*

Section 129D does not provide for any hearing at all – at any point in time.  Moreover, the only "notice" requirement that § 129D contains is its mandate that the bonded warehouse issue the owner a "receipt" that identifies each gun.  See M.G.L. c. 140, § 129D.  Defendant provided the requisite receipt only after it had taken custody of the property and imposed substantial fees.  Hence, Plaintiffs did not receive notice that Village Vault would take custody of their property and impose fees.  Rather, they received notice that Village Vault had already done so.

This violated Plaintiffs' right to due process.  The lack of a hearing plainly violates due process, as "it has become a truism that '*some* form of hearing' is required before the owner is finally deprived of a protected property interest."

-22-

Logan v. Zimmerman Brush Co., 455 U.S. 422, 433 (1982) (quoting Bd. of
Regents v. Roth, 408 U.S. 564, 570-571 n.8 (1972) (emphasis in source)).  The
after-the-fact receipt that § 129D requires is patently inadequate because (other
issues aside) the statute does not require this notice before the owner has become
liable to pay the fees and other terms imposed by Defendant.  The notice was not
"reasonably calculated, under all the circumstances, to apprise interested parties of
the pendency of the action and afford them an opportunity to present their
objections."  Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306. 314 (1950).
Rather, each Plaintiff faced the "proverbial Hobson's choice:  he must pay the
charges assessed against him or forfeit his" property.  Craig, 449 F. Supp. at 394.

     Decisions that concern towing and impoundment are uniform in requiring
both notice and a hearing to contest the application of storage and impoundment
fees.  See Sutton v. City of Milwaukee, 521 F. Supp. 733, 740 (E.D. Wis. 1981);
Hann, 462 F. Supp. at 866; Remm, 418 F. Supp. at 548 ("No notice or opportunity
for a hearing is provided before the assessment of towing fees and storage charges.
Individuals are deprived of a significant property interest and no extraordinary
circumstances justify the denial of due process."); Graff v. Nicholl, 370 F. Supp.
974, 985 (N.D. Ill. 1974) (three-judge court).  The Ninth Circuit's decision in
Stypmann is again instructive.  There, the court concluded that a law allowing
storage fees and a lien was invalid because it supplied no right to a hearing to

challenge the imposition of the fees.  See Stypmann v. City and County of San Francisco, 557 F.2d 1338, 1343 (9th Cir. 1977); see also Mays, 503 F. Supp. at 1262-63 ("towing and assertion of a de facto lien for towing and storage charges" is "a significant deprivation" and "an impartial hearing must be provided at some meaningful time").  Significantly, the state law in Stypmann did provide for a hearing prior to the ultimate auction of the vehicle – unlike here – but the court found that this hearing did not safeguard against the deprivations that the fee and lien powers themselves imposed.  See Stypmann, 557 F.2d at 1343-44; see also Wright, 533 F. Supp. at 64 ("the failure to afford a hearing prior to imposing a lien for storage costs in favor of the towing company is the constitutional violation"); Craig, 449 F. Supp. at 394 (plaintiffs "have two interests at stake in these ordinances:  the impounded cars and the required charges").

C. *Plaintiffs are Entitled to a Declaratory Judgment*

Plaintiffs established entitlement to a declaratory judgment pursuant to 28 U.S.C. § 2201 in two different respects.  First, Defendant violated the Plaintiffs' right to procedural due process by making them liable for fees and a lien without either adequate notice or a hearing.  Second, Defendant further violated the Plaintiffs' due process rights by conclusively depriving them of their property interests, again without providing adequate notice or the right to a hearing.  Both of these due process issues are squarely before this Court.  See generally Aetna Life

-24-

Ins. Co. v. Haworth, 300 U.S. 227, 239-40 (1937).  There is abundant authority

that Defendant was not entitled to collect fees that it had imposed without

providing due process protections.  See Draper v. Coombs, 792 F.2d 915, 923 n.13

(9th Cir. 1986) ("As the ordinance authorizing the towing is unconstitutional,

imposition of the lien was improper."); Hale v. Tyree, 491 F. Supp. 622, 626 (E.D.

Tenn. 1979) ("the City must return Mr. Hale's $ 92.00 pending a hearing

consistent with this opinion"); Miller v. City of Chicago, no. 82 C 1607, 1983 U.S.

Dist. LEXIS 11520, *17 (N.D. Ill. Nov. 18, 1983) ("the City must reimburse all

monies collected from those individuals subjected to this unconstitutional

practice").  Hence, Plaintiffs are entitled to declaratory judgment that Defendant's

imposition of these fees and liens violated their due process rights.  See, e.g.,

Tedeschi v. Blackwood, 410 F. Supp. 34, 46 (D. Conn. 1976) (three-judge court);

Graff, 370 F. Supp. at 987 (same).

Furthermore, Defendant also violated the Plaintiffs' due process rights when

it sold their property and used the proceeds to pay its fees.  See Propert, 948 F.2d

at 1334-35 (destruction of plaintiff's car without adequate notice or a hearing

violated due process); Assocs. Comm'l, 22 F. Supp. 2d at 505-06 (car was

auctioned).  Again, declaratory judgment is appropriate.  See, e.g., Assocs.

Comm'l, 22 F. Supp. 2d at 507 (granting declaratory judgment that divestiture of

title violated due process).

D. *Plaintiffs are Entitled to Money Damages*

Defendant is also liable for damages because it deprived Plaintiffs of their property interests without providing them with procedural due process protections. See Carey v. Piphus, 435 U.S. 247, 266-67 (1978). In this case, the inadequate notice and the lack of a hearing caused Plaintiffs to suffer actual injuries, and Plaintiffs are accordingly entitled to damages. See id. at 260. "[I]t has long been 'clearly established' that due process safeguards must be afforded." Amsden v. Moran, 904 F.2d 748 (1st Cir. 1990); see also Lawrence v. Reed, 406 F.3d 1224, 1233 (10th Cir. 2005); Ginorio v. Contreras, 409 F. Supp. 2d 101, 111-12 (D.P.R. 2006); Maguire v. Old Orchard Beach, 783 F. Supp. 1475, 1483 (D. Me. 1992). For example, in Spinelli v. City of New York, 579 F.3d 160 (2d Cir. 2009), the Second Circuit held the City of New York liable to pay damages where it had seized a gun dealer's license and firearms without providing procedural due process protections. See id. at 175.

Plaintiffs James Jarvis, Russell Jarvis, and Robert Crampton are accordingly entitled to partial summary judgment that Village Vault is liable to them in damages in an amount to be determined in the future. See, e.g., id. (finding procedural due process violation and remanding for determination of damages); Propert, 948 F.2d at 1336 (same); see also, e.g., Ferrari v. Suffolk, no. 10-CV-4218, 2013 U.S. Dist. LEXIS 110789, *22-23 (E.D.N.Y. Aug. 6, 2013) (finding

-26-

due process violation and granting partial summary judgment of liability); <u>Messere v. Fair</u>, 752 F. Supp. 48, 52 (D. Mass. 1990) (same).

## CONCLUSION

The deprivations that Defendant caused had a close operational nexus to the enforcement actions that police took against the Plaintiffs and the legal obligations that thereafter fell upon the police. Defendant is liable for the deprivations it caused in order to discharge these obligations. These deprivations resulted in substantial damages to the Plaintiffs, who completely lost their property to Defendant, and Plaintiffs established their entitlement to partial summary judgment. This Court should reverse.

Dated:        March 16, 2015

Patrick M. Groulx
Grollman, LLP
321 Columbus Avenue
Boston, Massachusetts 02116
(617) 859-8966 tel
(617) 859-8903 fax
*patrick@grollmanllp.com*

David D. Jensen
DAVID JENSEN PLLC
111 John Street, Suite 420
New York, New York 10038
(212) 380-6615 tel
(917) 591-1318 fax
*david@djensenpllc.com*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,502 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B).

2.      This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type.

Dated:      March 16, 2015

                                                              s/ David D. Jensen
                                                             David D. Jensen
                                                             Attorney for Plaintiffs-Appellants

CERTIFICATE OF SERVICE

On 16 March 2015 I served the foregoing brief by electronically filing it

with the Court's CM/ECF system, which generates a Notice of Filing and effects

service upon counsel for all parties in the case:

    Mark I. Zarrow, Esq.
    Lian, Zarrow, Eynon & Spofford
    mzarrow@lianzarrow.com

I affirm the foregoing statement under penalty of perjury under the laws of
the United States of America.


Dated:        March 16, 2015


                                    s/ David D. Jensen
                                   David D. Jensen
                                   Attorney for Plaintiffs-Appellants

# ADDENDUM CONTENTS

MEMORANDUM AND ORDER, OCT. 15, 2014 ...................................................... ADD. 1

FINAL JUDGMENT, NOV. 24, 2014 .................................................................. ADD. 25

M.G.L. C. 140, § 129D...................................................................................... ADD. 26

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                      )
RUSSELL JARVIS; JAMES JARVIS;         )
ROBERT CRAMPTON; and COMMONWEALTH     )
SECOND AMENDMENT, INC.                )
                                      )
                Plaintiffs,           )
                                      )       CIVIL ACTION
              v.                      )       NO. 1:12-40032-JLT
                                      )
VILLAGE GUN SHOP; and SECRETARY       )
ANDREA CABRAL, in her Official        )
Capacity as Secretary of the         )
Massachusetts Executive Office of     )
Public Safety and Security,           )
                                      )
                Defendants.           )
_____ )
```

YOUNG, D.J.                                   October 15, 2014

<u>MEMORANDUM AND ORDER</u>

## I.  **Introduction**

The Plaintiffs James Jarvis, Russell Jarvis, Robert

Crampton, and Commonwealth Second Amendment Inc. ("the Owners")

bring this 42 U.S.C. § 1983 action against the defendants

Village Gun Shop and Andrea Cabral, Secretary of the

Massachusetts Executive Office of Public Safety and Security.

The Owners allege that Secretary Cabral and Village Gun Shop

violated their Fourteenth Amendment rights to due process of the

law.  The Owners move for partial summary judgment, asking the

Court to rule that Village Gun Shop is a state actor, and it may be liable under section 1983 for damages stemming from a violation of due process.

## II. Legal Framework

### A. Relevant Statutory Framework for Firearm Ownership in Massachusetts

Massachusetts law requires that an individual obtain a Firearms Identification Card in order to possess, transfer or carry a firearm. Mass. Gen. Laws ch. 140, §§ 129B, 129C. A Firearm Identification Card can be suspended or revoked under specific circumstances defined by statute. See Id. at §§ 129B, 131(d),(f). Additionally, a Firearms Identification Card expires if not renewed within the time required by statute. Id. at §§ 129B, 131(i).

If a Firearms Identification Card is suspended or revoked the former card holder must surrender all firearms and the police are authorized to confiscate both the invalid card and any weapons the previous card holder possesses. See Id. at §§ 129B, 131(m). Once the owner surrenders the firearms, he or she may arrange for the property to be sold or transferred to a licensed person. Id. at § 129D. The police must hold the seized firearms for one year, but they are not required to maintain physical possession of the firearms for that entire year. Id. The police may transfer the firearms to a licensed

2

Add. 2

bonded warehouse for storage.  Id.  Upon transfer, the bonded
warehouse must: inspect the item, issue the owner a receipt
identifying the item as required by statute, and store the items
in accordance with licensing and statutory requirements.  Id.
Upon transfer to the bonded warehouse, the property owner
becomes liable for "reasonable" storage fees.  Id.  If the owner
has not paid the fees for ninety days, and fails to arrange for
a lawful transfer of the property, the bonded warehouse may
auction the property to recover its fees.  Id.

**A.  Summary Judgment**

The Owners ask this Court to grant partial summary judgment
and rule that Village Gun Shop is a state actor and is thus
liable for any violation of the Owner's Fourteenth Amendment
right to due process.  Pls. Mem. Law Supp. Partial Summ. J.
Against Village Gun Shop, Inc. ("Pls.' Mem.") 1, ECF No. 33.
"The court shall grant summary judgment if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56.  "Only disputes over facts that might affect the outcome
of the suit under the governing law will properly preclude the
entry of summary judgment."  Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986).  The facts recounted below - on which
the Court bases its decision - are undisputed.

## III. Factual Background

### A.  James Jarvis

 James Jarvis ("James") is a gun owner residing in Cheshire, Massachusetts.  Pls.' Statement Undisp. Material Facts ("Pls.' Facts") ¶ 1, ECF No. 34.  Prior to July 9, 2010, James held a valid Firearm Identification Card.  Am. Compl. 7, ECF No. 5.  On July 9, 2010, Massachusetts State Police arrested James for assault and battery on his wife.  Def. Sec'y Pub. Safety Statement Mat. Facts Resp. Pls.' Statement Material Facts("Def's Facts") ¶ 6, ECF No. 66.  On the same day, the North Adams District Court issued a temporary order of protection.  Pls.' Facts ¶ 19.  As a result of the restraining order, pursuant to state law, the police seized over thirty firearms, ammunition, and other weapons present at James's residence. Pls.' Facts ¶ 33; Def.'s Facts ¶ 6.  Additionally, on July 9, 2010, James appeared in the North Adams District Court, where a judge reviewed the restraining order issued that same morning.  Def.'s Facts ¶ 8.  The judge extended the order of protection until August 9, 2010, and set a hearing for that date.  Id.

James appeared at the August 9, 2010 hearing, represented by counsel.  Id. at ¶ 9.  The judge again extended the order of protection for approximately one year until August 2, 2011.  Id. Although James had been a licensed firearm carrier, his license was revoked as a result of the restraining order.  Pls.' Facts ¶

4

5.    Pursuant to Mass. Gen. Laws ch. 209A, § 3B, state police
seized the firearms present at James's home.  Id. at ¶ 22.
Additionally, the police notified James in writing that due to
the restraining order, his Firearms Identification Card was
suspended, and section 129D applied to the seizure of his
firearms.  Def. Sec'y Pub. Safety's Mem. Opp'n Pls.' Mot.
Partial Summ. J. Against Village Gun Shop, Inc. d/b/a Village
Vault ("Def's Mem. Opp'n") 6, ECF No. 65.  Police held the
seized firearms until August 11, 2010, at which time they
transferred the firearms to Village Gun Shop, a licensed bonded
warehouse operating in Northboro, Massachusetts.  Pls.' Mem. 5;
Pls.' Facts ¶ 49.

      Village Gun Shop received James's seized firearms from the
police on August 11, 2010.  Pls.' Facts ¶ 49.  On that same day,
Village Gun Shop sent James a receipt of the inventoried items
and a written policy governing the associated fees.  Def.'s Mem.
Opp'n 7.  James did not pay, however, and storage fees accrued
totaling $5,634.25.  Pls.' Mem. 8; Pls.' Facts ¶¶ 47, 48.
Village Gun Shop sent James written notice that the firearms
would be auctioned to cover the storage fees if he failed to
pay.  Def.'s Mem. Opp'n 7.  Village Gun Shop auctioned the
firearms on May 21, 2011, and September 24, 2011, for a total of
$2,695, and billed James $2,939.25 for the outstanding storage
fees.  Pls.' Mem. 7, 8; Def.'s Mem. Opp'n 7.

5

**B.  Russell Jarvis**

Russell Jarvis ("Russell") is a gun owner residing in Adams, Massachusetts.  Pls.' Facts ¶ 2.  Russell is James's Father, and stores his firearms in a locked gun cabinet at James's residence in Cheshire, Massachusetts.  Pls.' Facts ¶¶ 3, 11.  The firearms seized on July 9, 2010, included firearms purportedly owned by Russell.  Pls.' Facts ¶ 22.

After his firearms were seized in connection with the restraining order on James, Russell claims to have spoken with the police concerning the return of his firearms.  Pls.' Mem. 7, 8; Def.'s Mem. Opp'n 6.  At the time, however, Russell was not licensed to carry firearms, and therefore the police were unable to return the weapons to him.  Def.'s Mem. Opp'n 6.  Additionally, James had moved into Russell's house in Adams, Massachusetts, and the weapons could not be transferred to that location as long as the restraining order was in effect.  Id.

Neither party claims that Russell was ever billed directly for firearms storage.  Nonetheless, Russell refused to pay Village Gun Shop's storage fees, claiming that Village Gun Shop had no right to charge the fees.  Pls.' Facts ¶¶ 47, 48.  His firearms were auctioned along with James's on May 21, 2011, and September 24, 2011.

6

### C.    Robert Crampton

Robert Crampton ("Crampton") is a resident of Tewksbury, Massachusetts.  Pls.' Facts ¶ 37.  Crampton held a Firearms Identification Card issued to him in the 1970's.  Def.'s Facts ¶ 42.  The license stated that it was "valid unless revoked." Pls.' Facts ¶ 44.  Crampton, however, moved away from Massachusetts for some time, and when he returned the law had been amended to require renewal of all Firearm Identification Cards.  Pls.' Facts ¶ 44; see also 1998 Mass. Acts ch. 312, § 73, codified as amended at Mass. Gen. Laws ch. 140, § 129(b)(9). Crampton did not renew his original Firearm Identification Card. Def.'s Facts ¶ 44.

In April 2010, Crampton contacted Tewksbury Police in connection with the alleged robbery of his home.  Pls.' Facts ¶ 41.  Police responded to Crampton's call and, in the course of their investigation, became aware of Crampton's firearms. Def.'s Facts ¶ 45.  The police requested his Firearms Identification Card, and Crampton presented them with the expired card.  Id. at ¶ 45.  On June 2, 2010, the Tewksbury Police seized Crampton's firearms due to the fact that he no longer had a valid license to possess them.  Pls.' Facts ¶ 46. The police held the firearms until November 15, 2010, at which time the items were transferred to Village Gun Shop for storage. Id. at ¶ 53.

Village Gun Shop received Crampton's firearms from police on November 15, 2010.  Pls'. Mem. 5.  Village Gun Shop issued a receipt and fee policy to Crampton.  Id. at 6.  Crampton accrued storage fees of $586.  Id. at 8.  When Crampton's storage bill remained unpaid, Village Gun Shop auctioned the firearms for $185, and billed Crampton for the remaining $401 storage fee. Id.

### D.  Commonwealth Second Amendment, Inc.

Commonwealth Second Amendment, Inc. is a non-profit organization with its principal place of business in Natick, Massachusetts.  Am. Compl. 3.  It asserts that the purpose of the organization is research, education, publication, and legal action concerning Second Amendment rights.  Id. at 11. Commonwealth Second Amendment further claims that the organization has expended significant resources assisting members whose firearms are held in bonded warehouses, including Village Gun Shop, pursuant to Massachusetts General Laws chapter 140, section 129D.  Id.

## IV.  Analysis

The Owners filed this action pursuant to 42 U.S.C. § 1983, claiming that they experienced a deprivation of their Fourteenth Amendment right to due process.  Am. Compl. 5.  Specifically, the Owners claim that they were forced to pay storage fees without sufficient notice, and were permanently deprived of

their firearms without opportunity for a hearing.  Pls.' Mem. 2-3.  In this motion for partial summary judgment, the Owners ask the Court to rule that Village Gun Shop is a state actor for the purposes of this section 1983 action, and that Village Gun Shop is liable for damages accrued from the alleged due process violation.  Id.

### A.   Stating a Claim Under 42 U.S.C. § 1983

"To state a claim under [section] 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged depravation was committed by a person acting under the color of state law."  West v. Atkins, 487 U.S. 42, 49-50 (1988).  The Owners allege a violation of their Fourteenth Amendment right to due process.  Am. Compl.  Because this right is constitutional in nature, the first element of section 1983 is satisfied.

The Constitution secures rights and protections for the individual against government action.  Lugar v. Edmondson, 457 U.S. 922, 922-23 (1982).  Only the state, or an individual acting in an official capacity, can violate individual constitutional rights.  Id.  Private individuals and organizations, however, may also infringe on a protected right when acting on behalf of the state.  Id. at 929.  The Owners allege that Village Gun Shop, although a privately owned business, functioned as a state actor when it assessed fees for

9

storage and ultimately auctioned the seized firearms.  Am.
Compl. 12.  Specifically, the Owners allege that Village Gun
Shop deprived them of due process by assessing fees without
prior notice and permanently deprived them of their firearms at
auction with no opportunity for a hearing.  Id.  Because Village
Gun Shop cannot be liable for claims under section 1983 unless
it is considered a state actor, this Court must first determine
whether Village Gun Shop is a state actor within the meaning of
section 1983.

### 1.  State Action Under Section 1983

The Supreme Court has articulated several tests for
determining whether a private party is a state actor for the
purposes of section 1983.  Lugar, 457 U.S. at 937.  These tests
include: the state compulsion test, Adickes v. S.H. Kress & Co.,
398 U.S. 144 (1970); the nexus test, Jackson v. Metropolitan
Edison Co., 419 U.S. 345 (1974); the public function test, Marsh
v. Alabama, 326 U.S. 501 (1946); and the joint action test,
Flagg Brothers Inc. v. Brooks, 436 U.S. 149 (1978).  Courts
often use a combination of these tests or refer to several tests
interchangeably.  See, e.g., Estades-Negroni v. CPC Hospital San
Juan Capestrano, 412 F.3d 1 (1st Cir. 2005) ("We have employed
the following three tests to determine whether a private party
fairly can be characterized as a state actor: the state
compulsion test, the nexus/joint action test, and the public

10

function test."). In order fully to address the issue, this
Court conducts its analysis under each of these tests.

### a.    State Compulsion Test

The state compulsion test asks whether the state requires
or compels a private party to act in a way that violates a
constitutionally protected right.  Adickes, 398 U.S. at 169. The
Supreme Court confronted this issue in Adickes when it addressed
a state law that required restaurants to maintain segregated
seating and therefore discriminate on the basis of race.  Id.
The Adickes court held "that a State is responsible for the
discriminatory act of a private party when the State, by its
law, has compelled the act."  Id. at 170.  Because the
restaurant was compelled to discriminate on the basis of race by
law, the Supreme Court held that they were state actors and thus
could be liable for violating the Constitution by way of this
discrimination.  Id.

This test is an inappropriate fit in the present case
because state law does not require or compel Village Gun Shop to
act.  Village Gun Shop may seek a license to provide bonded
warehouse services, but the law does not require it to do so.
The police have a number of bonded warehouses to choose from,
and a facility affirmatively must seek a license to provide
bonded warehouse services.  Am. Compl. 1, 3.  Village Gun Shop
was not compelled by the state to obtain a license or provide

firearm storage services; therefore, Village Gun Shop cannot be considered a state actor under the state compulsion test.  Id.

### b.  Nexus Test

The nexus test asks "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself."  Jackson, 419 U.S. at 351. In Jackson, the defendant was a privately owned electric company, certified by the State of Pennsylvania to provide electric services to the city of York, Pennsylvania.  Id. at 346.  Pursuant to the agreement between the State and the defendant, the company reserved the right to discontinue service with "reasonable notice."  Id.  The plaintiff, Jackson, was a resident of York and an electric services customer.  Id.  The electricity account at her residence, however, was in another resident's name.  Id.  After several months of unpaid electric bills, the defendant sent employees to the residence to inquire as to the whereabouts of the individual listed on the account. Id.  The employees returned the following day, and Jackson requested that the account be transferred to another name.  Id. Rather than transfer the account, the defendant closed the account, and the electricity was turned off with no further notice.  Id.

In Jackson the Supreme Court held that the defendant was
not a state actor for the purposes of a section 1983 action.
Id. at 354.  The Court rejected Jackson's argument that holding
a monopoly over a specific, widely used service created a
sufficient nexus between government and private action to
warrant a ruling that the defendant was a state actor.  Id.
Specifically, the Court noted that the State did not interfere
with the charges and rate increases levied by the company, nor
was the state involved in the general business practices of the
company.  Id.  Additionally, the Court held that the fact that a
private entity is highly regulated by the State does not by
itself convert that entity into a state actor.  Id.  The Court
reasoned that many private entities are subject to heavy
government regulation, and the fact that a company is subject to
regulation is not sufficient to answer the controlling question
whether there is a sufficient nexus between the state and the
private entity.  Id.

Here the nexus between Village Gun Shop and the State is
more attenuated than the nexus the Supreme Court found
insufficient in Jackson.  While the Jackson Court stated that a
private company's monopoly over an industry is not dispositive
of state action, Village Gun Shop does not even have such a
monopoly.  Pls.' Mem.  Additionally, although Village Gun Shop
is licensed as a bonded warehouse and regulated by the State,

13

Add. 13

the Court in <u>Jackson</u> found the existence of state regulation to be insufficient grounds for finding state action.  Finally, like the defendant in <u>Jackson</u>, Village Gun Shop is free to set its own fee schedule and govern its own business practices which have not been challenged by the State.  Pls'. Mem. 3.  Village Gun Shop does provide a service that is authorized and regulated by state law.  This, however, does not create a sufficient nexus between the State and Village Gun Shop to warrant a ruling that Village Gun Shop is a state actor under the nexus test.

### c.    Public Function Test

The public function test looks to whether the private entity provides a service that exists "primarily to benefit the public and [whose] operation is essentially a public function." <u>Marsh</u>, 326 U.S. at 506.  If the service performed is traditionally one that the State undertakes, then it can fairly be described as a public function.  <u>Santiago</u> v. <u>Puerto Rico</u>, 655 F.3d 61, 69 (1st Cir. 2011).  The Supreme Court, however, has discerned but few private company functions that rise to the level of public functions and therefore create liability for constitutional violations.  These few functions include "the administration of elections, the operation of a company town, eminent domain, peremptory challenges in jury selection, and, in at least limited circumstances, the operation of a municipal

park." Perkins v. Londonderry Basketball Club, 196 F.3d 13, 19 (1st Cir. 1999).

The Supreme Court found state action in Marsh v. Alabama where the entire town of Chickasaw was owned by a private company. 326 U.S. at 506. The company exercised extensive control over the town's municipal functions and also paid the town sheriff's salary. Id. The Court held that because the company preformed many traditional government functions, the company was a state actor under the public function test when it infringed the First Amendment rights of a Jehovah's Witness resident who wished to distribute literature on the sidewalks. Id.

Conversely, the Court found no state action in Rendell-Baker v. Kohn. 457 U.S. 830, 831-32 (1982). In Rendell-Baker, the defendants operated a private school that received state funding and provided schooling to maladjusted students. Id. Several teachers brought an action claiming that the school had violated several of their constitutional rights in connection with their discharge. Id. The Court held as a preliminary matter that the school did perform the public function of providing education to certain students. Id. at 842. Simply because a private entity provides a service to the public, however, does not make them a state actor. Id. The Court reasoned that education of students outside the public school

15

Add. 15

system was not a service traditionally provided by the state, and the legislature's recent decision to provide funding for alternative schools was evidence of the State's new involvement. Id.

The First Circuit relied heavily on Rendell-Baker in a case applying the public function test to a private busing company providing school busing services. Santiago v. Puerto Rico, 655 F.3d 61 (2011). The Santiago Court reasoned that busing, like alternative education, had long been supplied by private entities, and therefore could not be considered a traditional government function. Id. at 69. Similarly, the First Circuit applied the public function test in a gender discrimination case against a youth basketball league. Perkins, 196 F.3d at 13. Again the Court held that youth sports were not a service traditionally provided by the states, and therefore the basketball league was not a state actor. Id. at 19.

Village Gun Shop does provide a service to the public. Firearm storage, however, is not a service traditionally provided by the state. The firearms in question are not being held as evidence, a function arguably reserved to the police. Under section 129D the police must hold the firearms for up to one year, but they are not obligated to retain physical possession for the entire period, as the owner may retrieve them with a valid Firearms Identification Card or transfer them to a

16

licensed third party. Mass. Gen. Laws ch. 140, § 129D. The
Owners may remove or transfer their property, or may conceivably
choose to store firearms beyond the one year period if they find
that the arrangement meets their needs.

The service that Village Gun Shop provides does not rise to
the level of government activity found in election
administration, privately owned towns, or corporately held
highways. <u>Terry</u> v. <u>Adams</u>, 345 U.S. 461 (1953); <u>Marsh</u>, 326 U.S.
501; <u>South Carolina State Highway Department</u> v. <u>Barnwell</u>
<u>Brothers</u>, 303 U.S. 177 (1938). The state does not traditionally
hold seized belongings for individuals once they are able to
claim them or provide for transfer to a third person.

This case is similar to <u>Rendell-Baker</u> and <u>Santiago</u> in one
other important respect. In both <u>Rendell-Baker</u> and <u>Santiago</u>,
the State had only recently passed legislation authorizing
government involvement with the private service, leading courts
to reason that the service had not been traditionally performed
by the state. <u>Rendell-Baker</u>, 457 U.S. at 831-32; <u>Santiago</u>, 655
F.3d at 70. In this case, the statute allowing firearm
transfers to bonded warehouses is also relatively new, lending
further support to a holding that Village Gun Shop is not
performing a traditional government service, and is not a state
actor under the public function test.

### 4. Joint Action Test

The final test for determining state action is the joint
action test. This test finds state action where a "private
party's joint participation with state officials in the seizure
of disputed property is sufficient to characterize that party as
a 'state actor.'" Lugar, 457 U.S. at 941. Again, this test
speaks to a question of degree, and asks a court to determine
what is "sufficient" joint participation.

Flagg Brothers Inc. v. Brooks, 436 U.S. 149 (1978), is
instructive on this point. Flagg Brothers operated a storage
facility in New York City. Id. at 153. Brooks, the plaintiff,
was evicted from her New York City apartment, and the city
marshal arranged for her belongings to be stored at the Flagg
Brothers facility. Id. Before the items were removed, Brooks
was notified of the costs associated with the moving and storage
of her belongings. Id. Brooks initially protested the cost and
the storage, but ultimately assented to the transfer. Id. She
continued to dispute the storage rates and refused to pay. Id.
Ultimately, Flagg Brothers notified her that she had ten days to
remove her belongings, or pay the bill. Id. Under the
circumstances, New York Uniform Commercial Code § 7-210
authorized Flagg Brothers to sell the items to recover unpaid
storage fees. Id. Upon receiving notice, Brooks brought an

action seeking an injunction against the sale of the items and a section 1983 claim alleging a violation of due process.  Id.

The Supreme Court found an insufficient connection between Flagg Brothers and the State, and held that Flagg Brothers was not a state actor.  Id. at 166.  The Court stated that the conflict was "a purely private dispute," and that the state involvement was simply a "system of rights and remedies" governing the dispute.  Id. at 160.  The Supreme Court pointed out that Brooks had many lawful options that did not include the sale of her belongings.  Id.

Flagg Brothers can be distinguished from the present case in that, in Flagg Brothers, the police never seized custody of the disputed property, nor did the police have a statutory duty to retain the property for any time.  Id.  The lack of police involvement there reduced the interaction to one between private parties.  The Owners, however, do not dispute the lawful nature of the original seizure.  Therefore, the origin of the conflict here are the fees charged by Village Gun Shop.  This is arguably a dispute between a creditor and a debtor.  In this regard, the present case is analogous to Flagg Brothers, and section 129D simply governs the permissible action for a dispute of this nature between private parties.

The present case is analogous to Flagg Brothers because like Brooks, the Owners may direct their property in many ways

19

that do not include the sale of the firearms.  436 U.S. 149; cf
Def.'s Mem. Opp'n 10-13.  The Owner's options include,
challenging the original seizure, retrieving the firearms from
the police before transfer to Village Gun Shop, transferring the
guns to a licensed third-party before transfer to Village Gun
Shop, retrieving the firearms from Village Gun Shop after
payment of fees, and continued storage at Village Gun Shop after
payment of fees.  Def.'s Mem. Opp'n 10-13.  State law creates
many avenues for resolving the concerns of the Owners, and
payment of fees was not the Owner's only option.

### c.    Towing and Impoundment Analogy

The Owners analogize to towing and impoundment cases in
which certain circuit courts have held that companies providing
towing and impoundment services are state actors.  Pls.' Mem.
10-11.  Although several federal courts have addressed the
question of state action in the tow and impoundment context, see
Smith v. Inskey's Inc., 499 F.3d 875 (8th Cir. 2007); Coleman v.
Turpen, 697 F.2d 1341 (10th Cir. 1982); Stypmann v. City &
County of San Francisco, 557 F.2d 1338 (9th Cir. 1977), the
First Circuit has not addressed the issue.  The Owners rely
heavily on the Ninth Circuit decision, Stypmann v. City & County
of San Francisco, in support of their argument.  557 F.2d 1338.

In Stypmann, state law authorized the towing and
impoundment of vehicles impeding traffic on city streets and

highways.  Id. at 1342.  The decision to tow a vehicle was at
the discretion of the police officer, and after the tow the
officer notified the owner and included the grounds for the tow
and the location of the car.  Id.  Once the car was towed the
owner became liable for the cost of the tow and storage.  Id.
The tow company also obtained an immediate lien against the
property for the costs.  Id.

In the Ninth Circuit's brief discussion of state action,
the Court ruled "joint activity" existed between the police and
the tow and impound company, and held that the company was a
state actor.  Id.  Although the Owners analogize to this factual
situation in their brief, the relationship between the police
and the private companies here is distinctly different.  In
Stypmann the police were unable to accomplish the state's
purpose absent the action of the private company.  State law
authorized the police to have vehicles removed from public
roadways where their presence created a safety risk.  Id. at
1340.  The police, however, are unable to accomplish this goal
without the aid of a tow company.  Additionally, the size of the
seized property requires a large facility for storage, again
necessitating the joint action of the impound lot.  The police
cannot undertake the action without the joint action of the
private company.

In the present case the police do not require the assistance of Village Gun Shop to accomplish the State's goals. The police were able to seize the firearms with no assistance from Village Gun Shop. Moreover, the police held the property for significant time with no assistance - over five months in Crampton's case. The police required no action at all from Village Gun Shop to effect the seizure. This distinction points up the significant divergence between the joint action present in Stypmann and the lack of joint action present in this case.

The Owners also cite Smith v. Inskey's Inc., 499 F.3d 875 (8th Cir. 2007), and Coleman v. Turpen, 697 F.2d 1341 (10th Cir. 1982), to support their argument. Coleman and Smith also confront the issue of state action in the context of private towing and impoundment companies. Both cases, however, deal with a factual situation separate from the one presented here. The properties seized in Coleman and Smith were seized in connection with a criminal investigation. The Eighth Circuit in Smith reasoned that the tow company "was performing the traditional governmental function of seizing and securing property for a criminal investigation." Smith, 499 F.3d at 880. Conversely, here the Owner's property was not seized or held by the police in connection with a criminal investigation. The police only retain control of the firearms until they can be lawfully transferred out of their care. This is not analogous

22

to the traditional government function of collection and retention of evidence.

The analysis in <u>Coleman</u> is similar to that in <u>Stypmann</u>.  In <u>Coleman</u> the Tenth Circuit focused on the joint action between the police and the private company.  The court highlighted the fact that the tow company was present throughout the entire police action in regard to the property.  In the tow and impound context the private company assists the police from start to finish in the deprivation of property – put differently, it is truly a joint action.  Unlike <u>Coleman</u>, Village Gun Shop does not interact with the police until the property deprivation has already occurred, and in some cases has been ongoing for quite some time.  This case is not analogous to <u>Coleman</u> and there is no joint action for the purposes of defining Village Gun Shop as a state actor.

## V.   Conclusion

Village Gun Shop was not coerced by the government into violating the Owner's rights, nor does it provide a traditional public function.  Additionally, Village Gun Shop's actions do not constitute a connection with state action sufficient to warrant a holding that it is a state actor under the nexus or joint function test.  The Court holds that Village Gun Shop is not a state actor for the purposes of this section 1983 action.  Accordingly, the Owner's Motion for Partial Summary Judgment is

23

DENIED and summary judgment is GRANTED to Village Gun Shop.  The
Court has the undoubted authority to enter summary judgment
against the moving party pursuant to Federal Rule of Civil
Procedure 56(f)(1).  Judgment will enter in favor of Village Gun
Shop at the close of the case.


SO ORDERED.




                                        /s/ William G. Young

                                         William G. Young
                                          District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.
1:12-40032 LTS

Russell Jarvis, Et Al
Plaintiffs

V.

Mary Elizabeth Heffernan, et al
Defendants

FINAL JUDGMENT

November 24, 2014

SOROKIN, J.

Final Judgment has entered in favor of Village Gun Shop as directed in Judge Young's opinion docket number [71] dated October 15, 2014.

SO ORDERED.

/s/ Leo T. Sorokin
UNITED STATES DISTRICT JUDGE

# M.G.L. c. 140, § 129D

§ 129D.  Surrender of Firearms upon Revocation, Suspension or Denial of Application for License or Firearm Identification Card; Rights of Owners; Disposition; Regulations.

Upon revocation, suspension or denial of an application for a firearm identification card pursuant to section 129B or for any firearms license if the firearm identification card is not then in force or for any machine gun license, the person whose application was so revoked, suspended or denied shall without delay deliver or surrender to the licensing authority where the person resides all firearms, rifles, shotguns and machine guns and ammunition which the person then possesses unless an appeal of the revocation or suspension is pending.  The person or the person's legal representative shall have the right, at any time up to 1 year after the delivery or surrender, to transfer the firearms, rifles, shotguns and machine guns and ammunition to any licensed dealer or any other person legally permitted to purchase or take possession of the firearms, rifles, shotguns and machine guns and ammunition and, upon notification in writing by the purchaser or transferee and the former owner, the licensing authority shall within 10 days deliver the firearms, rifles, shotguns and machine guns and ammunition to the transferee or purchaser and the licensing authority shall observe due care in the receipt and holding of any such firearm, rifle, shotgun or machine gun and ammunition; provided, however, that the purchaser or transferee shall affirm in writing that the purchaser or transferee shall not in violation of section 129C transfer the firearms, rifles, shotguns or machine guns or ammunition to the former owner.  The licensing authority shall at the time of delivery or surrender inform the person in writing of the authority's ability, within 1 year after delivery or surrender, to transfer the firearms, rifles, shotguns and machine guns and ammunition to any licensed dealer or other person legally permitted to purchase or take possession.

The licensing authority, after taking possession of any firearm, rifle, shotgun, machine gun or ammunition by any means, may transfer possession of such weapon for storage purposes to a federally and state licensed dealer of such weapons and ammunition who operates a bonded warehouse on the licensed premises that is equipped with a safe for the secure storage of firearms and a weapon box or similar container for the secure storage of other weapons and ammunition; provided, however, that the licensing authority shall not transfer to such dealer possession of any weapon that is or may be evidence in any current or pending criminal case concerning a violation of any general or special law, rule or

Add. 26

regulation governing the use, possession or ownership of such weapon. Any such dealer that takes possession of a weapon under the provisions of this section shall: (i) inspect such weapon; (ii) issue to the owner a receipt indicating the make, model, caliber, serial number and condition of each weapon so received; and (iii) store and maintain all weapons so received in accordance with such regulations, rules or guidelines as the secretary of the executive office of public safety may establish under this section. The owner shall be liable to such dealer for reasonable storage charges and may dispose of any such weapon as provided under this section by transfer to a person lawfully permitted to purchase or take possession of such weapon.

Firearms, rifles, shotguns or machine guns and ammunition not disposed of after delivery or surrender according to the provisions of this section shall be sold at public auction by the colonel of the state police to the highest bidding person legally permitted to purchase and possess said firearms, rifles, shotguns or machine guns and ammunition and the proceeds shall be remitted to the state treasurer. Any such weapon that is stored and maintained by a licensed dealer as provided under this section may be so auctioned at the direction of: (i) the licensing authority at the expiration of one year following initial surrender or delivery to such licensing authority; or (ii) the dealer then in possession, if the storage charges for such weapon have been in arrears for 90 days; provided, however, that in either case, title shall pass to the licensed dealer for the purpose of transferring ownership to the auctioneer; and provided further, that in either case, after deduction and payment for storage charges and all necessary costs associated with such surrender and transfer, all surplus proceeds, if any, shall be immediately returned to the owner of such weapon[.] . . .

*        *        *

The secretary of the executive office of public safety may make and promulgate such rules and regulations as are necessary to carry out the provisions of this section.

*        *        *