No. 14-2249

# United States Court of Appeals
## for the First Circuit

RUSSELL JARVIS, JAMES JARVIS, ROBERT CRAMPTON,
and COMMONWEALTH SECOND AMENDMENT, INC.,
*Plaintiffs-Appellants,*

*v.*

VILLAGE GUN SHOP, INC. D/B/A VILLAGE VAULT,
*Defendant-Appellee.*

**BRIEF OF AMICUS CURIAE COMMONWEALTH OF
MASSACHUSETTS AND EXECUTIVE OFFICE OF PUBLIC SAFETY
AND SECURITY IN SUPPORT OF DEFENDANT VILLAGE GUN SHOP
AND SUPPORTING AFFIRMANCE OF THE DISTRICT COURT'S
JUDGMENT**

MAURA HEALEY
*Attorney General
of Massachusetts*

David R. Marks
*Assistant Attorney General*
Court of Appeals Bar No. 1158588
Government Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2362
David.Marks@state.ma.us

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................iii

IDENTITY AND INTEREST OF AMICUS CURIAE ............................................ 1

ISSUES PRESENTED ........................................................................................ 1

INTRODUCTION................................................................................................ 1

LEGAL FRAMEWORK .................................................................................... 3

STATEMENT OF FACTS.................................................................................. 6

    State Police Seize James Jarvis's Guns Upon his Arrest for Assault
    and Battery on his Wife and the Issuance of a Domestic Abuse
    Restraining Order Against Him and, After One Month, Transfer
    Them to Village Vault. ...................................................................... 6

    The Tewksbury Police Take Robert Crampton's Guns, Since his FID
    Card Had Expired, and, After Five Months, Transfer Them to
    Village Vault. .................................................................................... 9

ARGUMENT ................................................................................................... 10

    I.    Plaintiffs Received All the Process Due When Their Guns Were
        Taken by the Police; the Statute Notified the Owners How the
        Guns Would Be Stored and Eventually Auctioned and Their
        Right to Sell or Transfer the Guns. ...................................... 10

        A.    The Statutory Scheme Puts Gun Owners on Notice of the
            Potential Transfer and Eventual Sale of Their Guns Upon
            Police Seizure. ........................................................ 11

        B.    Full Due Process Protection Accompanied the
            Suspension of Plaintiffs' Licenses and Seizure of Their
            Guns. ....................................................................... 12

    II.    The Legislature Has Provided All the Process That Is Due After
        the Police Lawfully Take Custody of Firearms, and the Owner
        Fails to Arrange for Their Sale or Transfer. ....................... 16

A.    Plaintiffs Have No Property Interest in the Police's
Statutorily-Authorized Choice Whether to Store Seized
Guns Free of Charge, or Transfer Them to a Private
Warehouse at the Owners' Expense.......................................... 17

B.    Due Process Requires No More Than the Statutory
Notice That the Police May Transfer Guns for Private
Storage. .................................................................................... 18

C.    The Notice Plaintiffs Seek is Not Properly a Due Process
Protection, as It Does Not Assist in a Challenge to the
Government's Decision. ............................................................ 21

III.   Village Vault is Not a State Actor. ..................................................... 24

CONCLUSION ...................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

Bd. of Regents of State Colleges v. Roth,
408 U.S. 564 (1972)............................................................ ......... 16, 17

Brentwood Academy v. Tennessee Secondary
School Athletic Ass'n,
531 U.S. 288 (2001)................................................................... 25

Cafeteria & Restaurant Workers Union v. McElroy,
367 U.S. 886 (1961)................................................................. 13

City of West Covina v. Perkins,
525 U.S. 234 (1999)............................................................. 11, 20

Clukey v. Town of Camden,
717 F.3d 52 (1st Cir. 2013)................................................... 17, 18

Commonwealth v. Gouse,
965 N.E.2d 774, 461 Mass. 787 (2012)........................................ 3

Commonwealth v. Gouse,
982 N.E.2d 504, 464 Mass 245 (2013)....................................... 20

Connecticut Dept. of Public Safety v. Doe,
538 U.S. 1 (2003)............................................................... 23, 24

Estades-Negroni v. CPC Hosp. San Juan Capestrano,
412 F.3d 4 (1st Cir. 2005)...................................................... 27

Flagg Bros., Inc. v. Brooks,
436 U.S. 149 (1978)............................................................ 24, 25

Godfrey v. Chief of Police,
616 N.E.2d 485, 35 Mass. App. Ct. 42 (1993) ............................. 14

iii

Goichman v. Rheuban Motors, Inc.,
    682 F.2d 1320 (9th Cir. 1982)............................................................. 26, 27n

Goldberg v. Kelly,
    397 U.S. 254 (1970) ........................................................................ 22

Gun Owners' Action League, Inc. v. Swift,
    284 F.3d 198 (1st Cir. 2002) ......................................................... 11, 19

Grand Pac. Fin. Corp. v. Brauer,
    783 N.E.2d 849, 57 Mass. App. Ct. 407,
    rev. denied, 791 N.E.2d 346, 439 Mass. 1108 (2003) ............................. 27n

Grapentine v. Pawtucket Credit Union,
    755 F.3d 29 (1st Cir. 2014)............................................................... 27

Henderson v. United States,
    574 U.S. ___, slip op. (May 18, 2015)................................................ 4n

Hightower v. City of Boston,
    693 F.3d 61 (1st Cir. 2012) ............................................................. 13

ICG Petroleum, Inc. v. U.S. Dep't of Energy,
    883 F.2d 80 (Temp. Emg'y Ct. of Appeals 1989) ................................... 20

Jackson v. Metropolitan Edison Co.,
    419 U.S. 345 (1974).......................................................................... 24

Logan v. Zimmerman Brush Co.,
    455 U.S. 433 (1982) ........................................................................ 21

Lugar v. Edmonson Oil Co.,
    457 U.S. 922 (1982) ........................................................................ 24

Matthews v. Eldridge,
    424 U.S. 319 (1976)..................................................................... 13, 22

Mead v. Independence Ass'n,

684 F.3d 266 (1st Cir. 2012) .......................................................... 27

Mitchell v. W.T. Grant Co.,
    416 U.S. 600 (1974) ................................................................. 12

Morrisey v. Brewer,
    408 U.S. 471 (1972) ................................................................. 13

Opinion of the Justices,
    536 N.E.2d 203, 408 Mass. 1215 (1990) ..................................... 18

Penney v. First. Nat. Bank of Boston,
    433 N.E.2d 901,
    385 Mass. 715 (1982) ............................................................... 25

Revell v. Port Authority of New York and New Jersey,
    598 F.3d 128 (3d Cir. 2010) ...................................................... 27n

Spinelli v. City of New York,
    579 F.3d 160 (2d Cir. 2009) ...................................................... 13

Texaco, Inc v. Short,
    454 U.S. 516 (1982) ................................................................. 18

United States v. DeBartolo,
    482 F.2d 312 (1st Cir. 1973) ..................................................... 19

United States v. Locke,
    471 U.S. 84 (1985) ....................................................... 19, 21, 22

**Federal Statutes**

42 U.S.C. § 1983 ........................................................................... 1

**Massachusetts Session Laws**

St. 1998, Ch. 180, § 29 ................................................................. 9n

St. 1998, Ch. 180, § 73 ................................................................. 9n

St. 1998, Ch. 358, § 11 ............................................................ 9n

St. 2004, Ch. 150, § 5 ............................................................

St. 2014, Ch. 284 ................................................................... 3n

**Massachusetts Statutes**

G. L. c. 140, § 121 ................................................................ 11

G.L. c. 140, § 128A .............................................................. 11

G. L. c. 140, § 129B ................................................. 3, 8, 14, 15

G. L. c. 140, § 129B (4) .................................................. 11, 14

G.L. c. 140, § 129B (5) ........................................................ 4

G. L. c. 140, § 129B (12) .............................................. 11, 15

G. L. c. 140, § 129B (15) ..................................................... 9n

G. L. c. 140, § 129C ...................................................... 3, 11

G. L. c. 140, § 129D ..................................... 2, 3, 4, 5, 6, passim

G. L. c. 140, § 131 ............................................................... 3

G. L. c. 140, 131 (a) .......................................................... 11

G. L. c. 140, 131(d) ............................................................. 3

G. L. c. 140, 131 (f) ...................................................... 3, 5, 11

G. L. c. 140, 131(i) ............................................................. 3

G. L. c. 140, 131(m) ...................................................... 3, 11

G.L. c. 140m, 131 5P(b) ...................................................... 20

G. L. c. 209A, § 3B ................................................................ 4, 13, 14

G. L. c. 209A, § 4 .................................................................... 3

G. L. c. 209A, § 5 .................................................................... 3

## **Court Rules**

Fed. R. App. P. 29(a) ............................................................... 1

## IDENTITY AND INTEREST OF AMICUS CURIAE

This amicus brief is filed pursuant to Fed. R. App. P. 29(a) on behalf of the Commonwealth of Massachusetts and its Executive Office of Public Safety and Security. These parties have an interest in upholding the constitutionality of the Commonwealth's laws and, specifically, in administering and enforcing its laws regulating firearms.

## ISSUES PRESENTED

1. Does due process require notice to gun owners before the police transfer lawfully seized guns to a private facility for storage at the owner's expense, pursuant to a statutory scheme granting the police discretion to make such transfers, where the owner has no right to contest the transfer and has failed to exercise his statutory right and opportunity to make other arrangements for the sale or transfer of his guns?

2. Is the private storage facility a state actor?

## INTRODUCTION

The plaintiffs-appellants James Jarvis, Russell Jarvis, Robert Crampton, and Commonwealth Second Amendment Inc. ("the plaintiffs") appeal from the dismissal of their 42 U.S.C. § 1983 action against Village Gun Shop, Inc. d/b/a Village Vault ("Village Vault") (in which the Secretary of the Massachusetts Executive Office of Public Safety and Security was formerly a defendant). Plaintiffs argue that Village Vault violated their Fourteenth Amendment rights to

due process of law when it took certain actions under G.L. c. 140, § 129D, the statute that enables gun owners to maintain their ownership interest in guns even when they lose the right to possess guns.

Police departments took custody of the plaintiffs' guns when they lost the legal right to possess or carry guns. Court hearings were held, or were available, for the plaintiffs to contest the loss of their firearms licenses and the surrender of the guns to the police. Plaintiffs do not challenge those actions.

Thereafter, the police departments kept custody of the guns for a period of time at the police station, and then exercised their discretion under the statute to transfer the guns for storage and safekeeping to a private bonded warehouse, licensed to store firearms and ammunition. Village Vault notified the plaintiffs of the transfers and invoiced the plaintiffs for the storage fees imposed. Ultimately, when each plaintiff failed to pay the outstanding storage fees, Village Vault, following the procedures in the statute, auctioned off the guns to pay several months of arrearages.

The plaintiffs claim that their guns' transfers to the storage facility and subsequent auctions violated their constitutional right to due process, even though authorized by the statute, and even though plaintiffs received invoices and notices of the sales. Because the plaintiffs were given all the process due under the Constitution, the judgment below should be affirmed.

# LEGAL FRAMEWORK

In general, in Massachusetts, in order to possess or carry a firearm and/or ammunition, a person must be issued a firearms identification card ("FID card") or a license to carry firearm. An FID card "allows the holder to own, transfer, or possess a firearm in his residence or place of business," under G.L. c. 140, §§ 129B, 129C. Commonwealth v. Gouse, 965 N.E.2d 774, 785 n.14; 461 Mass. 787, 799 n.14 (2012). A license to carry firearms generally allows the license holder to possess and carry firearms in public, beyond the licensee's residence or place of business. G.L. c. 140, § 131.[1] A licensing authority may suspend or revoke a license or FID card under certain circumstances, and it becomes invalid if it expires and is not renewed. See G.L. c. 140, §§ 129B, 131(d), (f), (i).

If a license or FID card is revoked or suspended, the holder must immediately surrender all firearms and ammunition in his possession to the licensing authority (usually the police department) where he resides, and a police officer is authorized to confiscate any firearms unlawfully possessed. See G.L. c. 140, §§ 129B(12), 131(m) (requiring compliance with provisions of G.L. c. 140, § 129D). Similarly, if a court issues an abuse prevention order under G.L. c. 209A, §§ 4 or 5, against a defendant who has been shown to present a substantial

---

[1] On August 11, 2014, the Governor signed legislation amending the Commonwealth's gun laws in many respects. St. 2014, Ch. 284. This brief will focus on the provisions in effect at the time of the events at issue.

likelihood of immediate danger of abuse, the defendant must surrender to police all firearms licenses, firearms, and ammunition "which he then controls, owns or possesses." G.L. c. 209A, § 3B (requiring compliance with G.L. c. 140, § 129D). A person aggrieved by the suspension or revocation of his FID card or license may petition for judicial review in the state District Court and is entitled to an evidentiary hearing. G.L. c. 140, §§ 129B(5), 131(f). If firearms have been surrendered upon the issuance of an abuse prevention order, the defendant may petition the court for review under G.L. c. 209A, §3B, and a hearing will be held within ten business days.

At issue here are the procedures under G.L. c. 140, § 129D governing surrender of firearms to law enforcement officials. Although the licensee must initially surrender his firearms to the police (or licensing authority), he has the right to later transfer or sell his firearms to another licensed person. The owner "shall have the right, at any time up to one year after [the] delivery or surrender, to transfer such firearms, rifles, . . . and upon notification in writing by the purchaser or transferee and the former owner, the licensing authority shall within ten days deliver such firearms, . . . to the transferee or purchaser." G.L. c. 140, § 129D.[2]

---

[2] This provision protects the firearms owner's ownership interest, and property right, in selling and otherwise disposing of his or her property. See Henderson v. United States, 575 U.S. __, slip op. at 5, 8 (May 18, 2015) (federal ban on possession of firearms by felon does not prohibit felon's transfer or sale of firearms
(footnote continued)

4

The statute does not require the police department itself to store the owner's property, if the owner does not otherwise arrange for sale or transfer. Rather, the police "after taking possession of any [guns] . . . or ammunition . . . , may transfer possession of such weapon for storage purposes to a federally and state licensed dealer of such weapons and ammunition who operates a bonded warehouse on the licensed premises that is equipped with a safe for the secure storage of firearms and a weapon box or similar container for the secure storage of other weapons and ammunition[.]" G.L. c. 140, § 129D. A dealer taking possession of a weapon must "(i) inspect such weapon; (ii) issue the owner a receipt indicating the make, model, caliber, serial number and condition of each weapon so received; and (iii) store and maintain all weapons so received in accordance with such regulations, rules or guidelines as the secretary of the executive office of public safety may establish under this section." Id. In return, "[t]he owner shall be liable to such dealer for reasonable storage charges and may dispose of any such weapon as provided under this section by transfer to a person lawfully permitted to purchase or take possession of such weapon." Id.

The statute provides for disposition of the weapons if the owner has failed for a year to arrange for their transfer or sale to another licensed person, or if the

---

(footnote continued)
to licensed transferee, as long as felon is prevented from subsequent control over firearms).

owner has not paid storage charges for over 90 days. If one year has passed, and

the licensing authority has maintained possession of the weapons, they "shall be

sold at public auction by the colonel of the state police to the highest bidding

person legally permitted to purchase and possess [the guns] . . . , and the proceeds

shall be remitted to the state treasurer." G.L. c. 140, § 129D. A weapon stored and

maintained by a licensed dealer "may be so auctioned at the direction of . . . the

licensing authority at the expiration of one year following the initial surrender" to

the licensing authority and, after deduction and payment for storage charges and

costs of surrender and transfer, any surplus proceeds shall be returned to the gun

owner. Id. Finally, a dealer then in possession may auction the weapons "if the

storage charges for such weapons have been in arrears for 90 days," subject to the

statute's other provisions. Id.

## STATEMENT OF FACTS

**State Police Seize James Jarvis's Guns Upon his Arrest for Assault and Battery on his Wife and the Issuance of a Domestic Abuse Restraining Order Against Him and, After One Month, Transfer Them to Village Vault.**

James Jarvis ("Jarvis"), who had held an FID card since 1980 (except for

one four-year period) and a license to carry firearms (since 2007), had his FID card

suspended in July 2010. (Deft's Stmt. ¶ 2-3.)[3] Russell Jarvis was first licensed to

---

[3] The following references are used herein: Appellants' Joint Appendix is "(App. #);" Defendant Secretary of Public Safety's Statement of Undisputed Material Facts And Response to Plaintiffs' Statement of Material Facts, docket number 66
(footnote continued)

have firearms in 1955 and has long held a valid license to carry, with the exception that the license expired in 2006, and he did not obtain a new license until July 28, 2010. (Deft's Stmt. ¶ 4.)

In approximately 2004 or 2005, James Jarvis built a gun cabinet in his house. (App. 45; Deft's Stmt ¶ 5.) Jarvis, his father Russell, and Jarvis's son all stored their guns in this cabinet, and each of them had free access and permission to take and use any of the guns. (App. 45-46; Deft's Stmt. ¶ 5.)

Early in the morning of July 9, 2010, Massachusetts State Police Troopers arrested Jarvis for assault and battery on his wife. As a result, the North Adams District Court, at 1:00 a.m. that day, issued an emergency restraining order against Jarvis not to abuse his wife, not to contact her, and to leave and stay away from their residence. As a result of this order, that same morning, the State Police seized the over 30 firearms, ammunition and other weapons and accessories that he possessed in his residence. (App. 46-48; Deft's Stmt. ¶ 6.)

At 9:45 a.m. the same day, both Jarvis and his wife appeared at a hearing in North Adams District Court and a judge reviewed the restraining order. The Court extended the order to August 9, 2010 and scheduled a hearing for that date. (Deft's

_____

(footnote continued)
(8/21/2014), is "(Deft's Stmt. ¶ # );" and the Affidavit of Defendant Village Gun Shop, Inc. d/b/a Village Vault in Opposition to Plaintiffs' Motion for Partial Summary Judgment Against Defendant, Village Gun Shop, Inc. d/b/a Village Vault By Peter G. Dowd, docket number 43 (11/22/2013), is "(Dowd Aff't ¶ # )."

Stmt. ¶ 8.)  At the August 9, 2010 hearing, Jarvis and his wife appeared, each represented by counsel.  After this hearing, the Court extended the restraining order for one year.  (App. 46; Deft's Stmt. ¶ 9.)[4]

Jarvis moved into his parents' house and lived there for two years.  (App. 46; Deft's Stmt ¶ 12.)  During that time, as long as the restraining order against James Jarvis was in effect, the State Police were not able to return the guns to Russell Jarvis, because of James's presence.  (Deft's Stmt. ¶ 12.)  couldlawfully giveApp. 48;

Russell Jarvis did not tell the State Police that he wanted to transfer his guns to a particular person; nor did James or Russell notify the police in writing to transfer the guns to anyone.  (Deft's Stmt. ¶ 13.)  On July 21, 2010, the Adams Police Chief sent James Jarvis a letter suspending his FID card, under G.L. c. 140, § 129B.  This letter informed Jarvis that his firearms must be surrendered, along with his FID Card, to the licensing authority where he resided, "in accordance with M.G.L. c. 140, § 129D."  (Deft's Stmt. ¶ 14.)  Jarvis did not look at that statute or ask his lawyer to.  (Deft's Stmt. ¶ 14.)

---

[4] On August 2, 2011, the date the restraining order expired, the Court vacated the order, including the order that Jarvis surrender all guns, ammunition, and gun licenses.  (Deft's Stmt. ¶ 10.)

On August 11, 2010, at the request of the State Police, Village Vault, a licensed firearms dealer with a bonded storage facility, took Jarvis's guns, accessories, and ammunition for further storage. Village Vault inventoried the items and sent the inventory, with a letter disclosing its fees, to Jarvis that same day. (App. 50; Dowd Aff't ¶¶ 11-13.) Village Vault inventoried 34 items of Jarvis's, including guns and ammunition. (App. 52; Dowd Aff't ¶ 13 and attached Exhibit B.) It charged an initial handling fee of $15 per item, a storage fee of $0.50 per day per item, and a one-time administrative fee of $45.00. (App. 52; Dowd Aff't ¶ 14 and attached Exhibit C.)

When Jarvis failed to pay the storage fees, detailed on the invoices regularly sent to him, Village Vault notified him in writing that it would auction the guns to pay the outstanding fees. On May 21, 2011 and September 24, 2011, Jarvis's guns were auctioned by Village Vault. (App. 55; Dowd Aff't ¶¶ 14-16.)

### The Tewksbury Police Take Robert Crampton's Guns, Since his FID Card Had Expired, and, After Five Months, Transfer Them to Village Vault.

Plaintiff Robert Crampton's FID card, first issued in the late 1960's, expired on April 16, 2000.[5] (Deft's Stmt. ¶ 17.) On June 1, 2010, in the course of investigating a reported break-in, Tewksbury Police learned that Crampton

---

[5] In 1998, G.L. c. 140, § 129B was amended by St. 1998, Ch. 180, § 29, which made FID cards valid for four years and caused Crampton's to expire on April 16, 2000. See St. 1998, Ch. 180, § 73. See also St. 1998, Ch. 358, § 11, amending St. 1998, Ch. 180, § 73.

possessed two firearms even though his FID card was expired. After Crampton gave his firearms and ammunition to the police, on June 2, 2010, the police told him that he needed to obtain a current license or FID card. (App. 49-50; Deft's Stmt. ¶18.) Crampton neither requested to transfer his guns and ammunition to anyone, nor applied for a new FID card or license to carry. (Deft's Stmt. ¶ 19-20.) On November 15, 2010, Tewksbury Police transferred Crampton's firearms and ammunition to Village Vault for continued storage. That same day, Village Vault inventoried Crampton's firearms and mailed him the inventory and a letter disclosing its storage terms. (App. 51; Dowd Aff't ¶¶ 17-18.) Crampton failed to pay the invoiced fees and, after notifying him in writing, Village Vault, on September 24, 2011 and November 19, 2011, auctioned his guns. (App. 55; Dowd Aff't ¶¶ 19-21.)

## ARGUMENT

I.  **Plaintiffs Received All the Process Due When Their Guns Were Taken by the Police; the Statute Notified the Owners How the Guns Would Be Stored and Eventually Auctioned and Their Right to Sell or Transfer the Guns.**

Plaintiffs had either the opportunity for a judicial hearing, or an actual hearing, regarding the propriety of the license suspensions and seizure of their guns, and they do not contest, or claim any violation of rights in, the police taking custody of their guns. The statute provided all the notice necessary regarding how

the police would arrange for storage of their guns and the plaintiffs' right to make alternative arrangements.

## A. The Statutory Scheme Puts Gun Owners on Notice of the Potential Transfer and Eventual Sale of Their Guns Upon Police Seizure.

Gun owners are on notice that G.L. c. 140, § 129D permits the police to transfer guns to a storage facility, permits the storage facility to charge the owner "reasonable storage charges," and permits the guns to be auctioned if the charges are not paid. The statute itself gives the owner all the notice necessary. See City of West Covina v. Perkins, 525 U.S. 234, 241 (1999) (an owner who has been informed that his property has been seized "can turn to [published, generally available state statutes and case law] to learn about the remedial procedures available to him," and due process requires nothing more). The plaintiffs are licensed to possess firearms and, as such, are presumed to know and be familiar with the laws governing their responsibilities as licensed persons. See Gun Owners' Action League, Inc. v. Swift, 284 F.3d 198, 207 (1st Cir. 2002). Several statutes governing firearms licensing and possession refer to section 129D, see G.L. c. 140, §§ 121; 128A; 129B (4), (12); 129C; 131(a), (f), (m). (The Adams Police Department, moreover, specifically notified Jarvis section 129D applied to him.)

G.L. c. 140, § 129D authorizes the licensing authority or police department to dispose of an owner's guns, if unclaimed after one year, but also gives the owner the right, within that year, to have the guns sold or transferred to another person licensed to possess firearms. But if the owner does not sell or transfer his guns or have his right to possess them reinstated, he is responsible for all storage fees and risks losing his firearms for failure to pay. Id. The statute does not require the police to store or maintain custody of an owner's firearms, free of charge. Rather, the statute grants the police department discretion to transfer them to a licensed dealer for storage, if the owner does not otherwise transfer them, until the year is up. This storage of the firearms is solely for the owner's benefit, and, by failing to sell or transfer his guns, the owner is deemed to have consented to storage by the licensed dealer, for which the owner is liable to pay a "reasonable" fee. G.L. c. 140, § 129D.

**B.    Full Due Process Protection Accompanied the Suspension of Plaintiffs' Licenses and Seizure of Their Guns.**

"The constitutional guarantee of procedural due process applies to governmental deprivation of a legitimate 'property' or 'liberty' interest within the meaning of the Fifth or Fourteenth Amendment. It requires that any such deprivation be accompanied by minimum procedural safeguards, including some form of notice and a hearing." Mitchell v. W.T. Grant Co., 416 U.S. 600, 624 (1974) (Powell, J. concurring). "[D]ue process is flexible and calls for such

procedural protections as the particular situation demands. 'Consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.'" Morrisey v. Brewer, 408 U.S. 471, 481 (1972), quoting from Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895 (1961). A post-deprivation hearing may satisfy due process in certain circumstances, depending on a balance of competing interests. See Matthews v. Eldridge, 424 U.S. 319, 335 (1976).

Given the circumstances here - the risk presented by unlicensed or violently abusive persons continuing to possess firearms - immediate seizure of the weapons with a subsequent hearing within a short time is consistent with due process. Hightower v. City of Boston, 693 F.3d 61, 84-86 (1st Cir. 2012) (due process does not require pre-deprivation hearing before suspending license to carry firearms, given public health and safety concerns); Spinelli v City of New York, 579 F.3d 160, 170 (2d Cir. 2009) (no pre-seizure hearing required before seizing dealer's license and firearms upon discovering gun shop's inadequate security).

And the plaintiffs here did indeed have post-deprivation opportunities to be heard. The weapons in Jarvis's possession were taken after a judge issued a restraining order under G.L. c. 209A § 3B, which specifically authorizes the

seizure, upon the required showing, and incorporates G.L. c. 140, § 129D. This hearing may be held at the same time as the hearing provided by G.L. c. 209A, § 4, 2nd par. (defendant has right to be heard within ten business days on whether temporary abuse prevention order should be extended). G.L. c. 209A, § 3B. Here, Jarvis received a hearing the same day the restraining order was issued. The court extended the order for 30 days, at which point Jarvis appeared with counsel for another hearing, where the order was again extended.

In the meantime, the Adams Police notified Jarvis that his FID card was suspended, due to the issuance of the restraining order. See G.L. c. 140, § 129B. The letter told Jarvis to surrender his firearms and notified him that the provisions of G.L. c. 140, § 129D applied to him. Under G.L. c. 140, § 129B, Jarvis was allowed to petition the District Court to contest this suspension at an evidentiary hearing, but did not do so. Godfrey v. Chief of Police, 616 N.E.2d 485, 487, 35 Mass. App. Ct. 42, 44-45 (1993). Jarvis did not get his FID card or license to carry reinstated, due to the continuing validity of the restraining order, nor did he ever present the State Police written notification of a sale or transfer to another legally authorized person (per G.L. c. 140, § 129D). Jarvis having failed to do so for more than a month, the State Police transferred his weapons and ammunition to Village Vault for continued storage.

14

Crampton also received an opportunity for a hearing. When the Tewksbury Police discovered he possessed firearms despite the expiration of his FID card, he surrendered them as G.L. c. 140, § 129B(12) required. Under G.L. c. 140, § 129B, Crampton had the right to contest the surrender by seeking a hearing in the District Court. And, if he had applied for, and was granted, a renewed or reissued FID card, he would have been entitled to return of his firearms. See G.L. c. 140, § 129B(12)(referring to provisions of § 129D). More than five months after he surrendered his firearms, Crampton not having sought a new FID card or notified the police in writing to transfer his guns to another person, the Tewksbury Police transferred the firearms to Village Vault for continued storage.

The plaintiffs thus had more than adequate due process when their firearms were seized and kept under G.L. c. 140, § 129D. Once the police had lawful custody, § 129D authorizes retention of an owner's firearms for one year and, at the end of that year, sale of the firearms. It is entirely in the owner's power to avoid that sale by arranging for an earlier sale or transfer, or by having his right to possess firearms reinstated. But if the owner fails to take any action, then the statute permits the sale. The statute thus preserves the gun owner's ability to maintain his ownership rights despite having lost possessory rights – but not at the cost of requiring the police to store guns free of charge, indefinitely.

**II.** **The Legislature Has Provided All the Process That Is Due After the Police Lawfully Take Custody of Firearms, and the Owner Fails to Arrange for Their Sale or Transfer.**

The plaintiffs argue that the Constitution further requires due process - that is, notice and a hearing - when a police department chooses to exercise its discretion under G.L. c. 140, § 129D to transfer firearms to a licensed dealer for further storage and when the dealer auctions off the guns, in the event the owner fails to pay assessed storage fees for 90 days. Yet the plaintiffs have no legitimate property interest in - no "legitimate claim of entitlement" to - the indefinite, cost-free maintenance of seized firearms in the hands of the police; the statute grants the police discretion to decide when and whether to transfer the firearms to a licensed dealer for storage. See Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972). The plaintiffs err in asserting that G.L. c. 140, § 129D "requires police departments to store [seized] guns for a period of one year." (Pltf's Br. 2, 15.) Rather, in enacting this statute, the legislature chose to preserve the owner's ownership rights for one year - despite the owner's loss of possessory rights - but also gave gun owners notice that police departments may choose to store the guns for this period at a private storage facility at the owner's expense. Accordingly, due process does not require police departments to hold a hearing before exercising their indisputable discretion to transfer the guns to an appropriate storage facility.

**A.**     **Plaintiffs Have No Property Interest in the Police's Statutorily-Authorized Choice Whether to Store Seized Guns Free of Charge, or Transfer Them to a Private Warehouse at the Owners' Expense.**

Whether a property right exists depends on whether state law creates an entitlement, or whether state law invests state actors with discretion to withhold the benefit.  See Clukey v. Town of Camden, 717 F.3d 52, 56 (1st Cir. 2013).  To find a "legitimate claim of entitlement," a court will look to the "existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  Bd. of Regents, 408 U.S. at 577.  Where "statutory and administrative standards defining eligibility for [welfare benefits]" exist, for example, compliance with those standards is protected by procedural due process.  Id. at 576.  On the other hand, a teacher's contractual appointment for only one year, without any rights to re-employment or statutory or administrative standards defining eligibility for re-employment, does not create a legitimate entitlement to re-employment sufficient to amount to a property interest protected by due process.  Id. at 578.  If government officials can grant or deny a benefit in their discretion, without standards to circumscribe that discretion, and without any limitation in the law establishing the claimed entitlement then, for the purposes of due process, no property interest exists.  Clukey, 717 F.3d at 56.

Here, G.L. c. 140, § 129D gives the police broad discretion and authority to decide when and whether to transfer weapons to a licensed dealer for storage purposes, specifying no criteria or standards for the exercise of that discretion, excepting that "[t]he licensing authority shall not transfer . . . any weapon that is or may be evidence" in a criminal case. G.L. c. 140, § 129D. Since the plaintiffs' guns were not held as evidence, nothing limited the police department's authority to transfer the guns to a dealer for storage. Thus, the plaintiffs had no legitimate entitlement to have the police maintain custody and store their guns, free of charge, and no property right that could form the basis of a procedural due process claim. See Clukey, 717 F.3d at 56.

**B.    Due Process Requires No More Than the Statutory Notice That the Police May Transfer Guns for Private Storage.**

The owners had notice of the possibility the police would transfer their firearms to a licensed dealer for storage, by the language of the statute itself.

G.L. c. 140, § 129D gave the plaintiffs sufficient notice that their guns could be turned over to a private storage facility should they fail to take affirmative action. Indeed, "persons owning property within a State are charged with knowledge of relevant statutory provisions affecting the control or disposition of such property." Opinion of the Justices, 536 N.E.2d 203, 207, 408 Mass. 1215, 1220 (1990), quoting from Texaco, Inc. v. Short, 454 U.S. 516, 532, 537 (1982) (due process satisfied by enactment of "rule of law uniformly affecting all citizens

that establishes the circumstances in which property interest will lapse through the inaction of the owner"). The statute notified the plaintiffs that, if they did not make other arrangements, the police were authorized to transfer their guns to a private facility for storage at the owner's expense, and that, if the owner did not arrange for transfer of the guns or regain the right to possess them, the guns would be sold at auction. G.L. c 140, § 129D. See also United States v. Locke, 471 U.S. 84, 104-108 (1985) (legislation may properly alter generally applicable property rights, notice provided by the enactment itself is sufficient due process, and failure of property owners to inform themselves of legal requirements does not result in due process violation when government fails to give additional notice of law).

Moreover, a heightened presumption of notice attaches to the plaintiffs' status as firearm owners and persons licensed to carry firearms under a comprehensive licensing and regulatory scheme. As licensed gun owners they are expected to know the laws and regulations governing gun possession, use, and ownership. See Gun Owners' Action League, Inc. v. Swift, 284 F.3d 198, 207 (1st Cir. 2002) ("all owners of firearms are on notice that they are subject to regulation, including licensing"); United States v. DeBartolo, 482 F.2d 312, 316 (1st Cir. 1973) (where firearms are involved, "the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation") (internal quotations and citations

omitted); <u>Commonwealth v. Reyes</u>, 982 N.E.2d 504, 511, 464 Mass. 245, 252-253 (2013) ("presum[ing] that gun owners are familiar with [state and federal firearms laws] because in order to obtain either a firearm identification card or a license to carry a firearm in Massachusetts, a prospective gun owner must receive a basic firearm safety certificate," and noting the required curriculum includes "*applicable laws relating to the possession, transportation and storage of firearms*") (quoting G.L. c. 140, § 131P(b); emphasis in original). <u>See also</u> <u>ICG Petroleum, Inc. v. U.S. Dep't of Energy</u>, 883 F.2d 80, 82 (Temp. Emg'y Ct. of Appeals 1989) (companies working in heavily regulated industry are reasonably expected to know regulatory obligations, and existence of regulations constitutes notice that satisfies due process).

Nor does due process require individual notice to an owner of seized property of the state-law remedies available to seek return. <u>City of West Covina v. Perkins</u>, 525 U.S. 234, 241 (1999) (owner informed of seizure "can turn to [published, generally available state statutes and case law] to learn about the remedial procedures available to him" and due process requires nothing more). Upon seizure of their firearms, the plaintiffs could have read the statute and learned that if they failed to sell or transfer their own guns (as the statute allowed), the police might, in their discretion, transfer the guns to a licensed dealer for

storage, at the owner's expense, and that, after a year, the guns could be sold regardless of whether they paid storage fees.

Here, over a month passed after Jarvis's weapons were seized and, when the restraining order was extended for a year and Jarvis had not otherwise arranged for the guns' sale or transfer, the State Police transferred them to Village Vault. Crampton's guns were given to Village Vault after sitting in the Tewksbury Police Department for over five months, with Crampton failing to get his FID card reinstated or transfer his weapons to anyone else. Both had constitutionally adequate, statutory notice that their inaction might result in the guns being transferred for continued storage. See Locke, 471 U.S. at 104-108.

### C. The Notice Plaintiffs Seek is Not Properly a Due Process Protection, as It Does Not Assist in a Challenge to the Government's Decision.

The notice plaintiffs seek – notice prior to police transfer of the guns to the licensed dealer – is not the type of notice needed for, and does not serve the purpose of, due process:  that is, to apprise the owner of a pending action, and the legal and factual basis for the action, and to allow the owner to contest the basis at a hearing before an impartial decision-maker. See, e.g., Logan v. Zimmerman Brush Co., 455 U.S. 422, 433-434 (1982) (some form of hearing is required to give owner chance to present his claim of entitlement before property is taken or destroyed). Rather, plaintiffs seek notice in the nature of a warning simply to

prompt them to seek the statutory alternatives to, and avoid the consequences of, the transfer. Such additional notice might be useful, but the legislature was not constitutionally required to include it in the statutory scheme. See Locke, 471 U.S. at 104-108.

The specific notice plaintiffs seek, and the hearing they claim was due before their guns were auctioned for nonpayment of the fees, are not designed to satisfy the purposes of due process protections. Due process protections are intended to allow a person, whose life, liberty, or property is sought to be taken by the government, to know the legal and factual basis for the government action and test its correctness before an impartial decision-maker. See Goldberg v. Kelly, 397 U.S. 254, 267 (1970); Matthews v. Eldridge, 424 U.S. 319, 335, 344 (1976) (due process protections address the "risk of error inherent in the truthfinding process"). Plaintiffs have failed to identify any such potential risk of error here. Indeed, the notice plaintiffs seek is not designed to allow the owner to contest the basis for the intended transfer – the plaintiffs do not contest that basis. Rather, it would simply be an additional warning to spur gun owners to exercise the statutory options to avoid the transfer, options plaintiffs had but failed to exercise. See Locke, 471 U.S. at 107 ("Appellees failed to inform themselves of the proper filing deadline and failed to file in timely fashion the documents required by federal law. Their property loss was one appellees could have avoided with minimal burden; it

was their failure to file on time – not the action of Congress – that caused the property right to be extinguished.").

Moreover, since transfer of the weapons for storage is in the police's sole discretion by statute, there is no basis to challenge a transfer. Plaintiffs contend, in effect, that if the police are going to transfer the guns to a fee-charging dealer for storage, the plaintiffs have a due process right to oppose the police department's exercise of that discretion. Yet there would be nothing to contest at such a hearing, since the plaintiffs have no statutory or other right to free storage of their guns at the police department. Plaintiffs' claim therefore fails for similar reasons as that of Connecticut sex offenders who claimed that, prior to their being listed on the state's sex offender registry, they were entitled to a hearing to determine whether they were currently dangerous. The Supreme Court disagreed, pointing out that, under the state law at issue, listing on the sex offender registry was based solely on whether the person had a conviction for certain crimes; due process did not require a hearing to establish dangerousness, since it was not material to the state's decision-making. <u>Connecticut Dept. of Public Safety v. Doe</u>, 538 U.S. 1, 7-8 (2003). Likewise, here, there is no material fact in dispute to establish at a hearing.

Also as in the <u>Connecticut</u> case, no hearing is required here to satisfy due process concerns that an impartial decision-maker decide disputed issues of fact and law, to help ensure a sound and reliable basis for the action. Whether the

licensed dealer is entitled to auction the guns, after 90 days of arrears in the payment of storage charges, depends solely on the simple question of whether the storage fees were paid or not. This fact should easily be determinable (and, indeed, is not contested here), requiring no special procedural protections - just as, in Connecticut, no hearing was required to establish the simple fact of the plaintiff's qualifying conviction for inclusion on the sex offender registry.

Thus, the statute provided all the notice that was due, and no further protections are required by the due process clause.

## III. Village Vault is Not a State Actor.

Finally, by accepting possession of the firearms, the storage facility did not become an agent of the government; to the contrary, the storage facility was acting in the service of the gun owners, storing their property until they became re-authorized to possess it or otherwise disposed of it.

The Due Process Clause of the Fourteenth Amendment only applies to state action, or to deprivations caused by a "person who may fairly be said to be a state actor." Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982). A private party may be considered a state actor if it is exercising, or has been delegated, a power "traditionally exclusively reserved to the State." Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 157-158 (1978), quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 352 (1974). Plaintiffs fail to make any showing that the storage of private

property is a function the State traditionally performed alone.  Nor is it enough that a state statute authorized the private entity's acts or even that the state acquiesced in the conduct.  Flagg Bros., 436 U.S. at 164-165 (creditor's self-help remedies, authorized by statute, including warehouseman's sale of goods to satisfy overdue storage charges, was not state action).  See also Penney v. First Nat. Bank of Boston, 433 N.E.2d 901, 904, 385 Mass. 715, 718-719 (1982) (creditor's repossession and sale of boat to pay overdue note, although done under the authority of state statute, did not constitute state action).

All the police department did here was to give a specific dealer possession of firearms for storage.  The police did not require or coerce Village Vault to store the firearms, did not require the assessment of any particular storage fees, did not require the sale of guns to satisfy unpaid charges, and had no involvement in any of Village Vault's activities.  The statute sets minimum standards for Village Vault to satisfy, in order to properly store the owner's guns and assert its remedies in the event of non-payment.  This looks nothing like those cases in which state action has been found in a private entity's conduct.  See Brentwood Academy v. Tennessee Secondary School Athletic Ass'n, 531 U.S. 288, 296-297 (2001) (surveying examples showing state action or not).

The cases upon which plaintiffs rely to show state action, involving private towing companies' seizure, towing, and storage of cars and assessment of storage

fees, are inapposite. This is because, in towing cases, a government official makes the initial decision to tow the car, instructs the private company to tow the car, and the car is stored and kept as security for payment of the parking violations and overdue fines owed to the government agency. See e.g., Goichman v. Rheuban Motors, Inc., 682 F.2d 1320, 1322 (9th Cir. 1982). No such joint action takes place here. The police department has no interest secured by the guns, nor any obligation – traditional, statutory, or otherwise – to store private property. The owner has the right to sell or transfer his guns and, in the meantime, storage of the owner's guns is meant to protect the owner's remaining ownership interests, during the one year the statute gives the owner to deal with the property he lacks the right to possess. Beyond the general governmental interest in keeping guns out of the hands of unlicensed individuals, storage of the guns was not in the government's interest but was for the owner's benefit. See also Appellant's Add. 20-23 (District Court's decision further distinguishing impoundment cases).[6]

Only rarely is a private party's conduct attributed to the State. Since Village Vault was not authorized to exercise state power, did not engage in a joint effort or participate in otherwise governmental action, and did not engage in a public function usually reserved to the state, Village Vault was not a state actor for the

---

[6] Notably, the impoundment cases relied on by the plaintiffs found a due process violation only where – in contrast to the circumstances here – no hearing was provided to contest the seizure of their property.

purposes of due process.[7] See Grapentine v. Pawtucket Credit Union, 755 F.3d 29,

(1st Cir. 2014); Mead v. Independence Ass'n, 684 F.3d 226, 231-233 (1st Cir.

2012); Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 4-8 (1st

Cir. 2005).

---

[7] This does not mean that a person aggrieved by Village Vault's alleged violation
of the law has no remedy. Such a person may bring an action for conversion,
claiming wrongful detention of property. See Grand Pac. Fin. Corp. v. Brauer,
783 N.E.2d 849, 857, 57 Mass. App. Ct. 407, 413 rev. denied, 791 N.E.2d 346, 439
Mass. 1108 (2003) (stating elements of conversion). See Revell v. Port Authority
of New York and New Jersey, 598 F.3d 128, 138-139 (3d Cir. 2010) (civil
conversion action adequate post-deprivation remedy for wrongful retention of
property); Goichman v. Rheuban Motors, Inc., 682 F.2d 1320, 1325-1326 (9th Cir.
1982) (due process satisfied where civil remedy for conversion is available to
challenge reasonableness of towing and storage fees).

## CONCLUSION

For all the foregoing reasons, the judgment of the District Court should be affirmed.

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS, and EXECUTIVE OFFICE OF PUBLIC SAFETY AND SECURITY,

By their attorney,

MAURA HEALEY
ATTORNEY GENERAL

/s/ David R. Marks
David R. Marks
Court of Appeals Bar No. 1158588
Assistant Attorney General
Office of the Attorney General
One Ashburton Place, Room 2019
Boston, MA 02108-1698
(617) 963-2362
Facsimile: (617) 727-5785
david.marks@state.us.ma

May 26, 2015

<u>**CERTIFICATE OF COMPLIANCE**</u>

1.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2007 in 14 point Times New Roman.

2.      This brief complies with the type-volume limitation of Fed. R. 29 (d) because it contains 6,791 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B).

/s/ David R. Marks

David R. Marks
Court of Appeals Bar No. 1158588

## CERTIFICATE OF SERVICE

    I hereby certify that the above Amicus Brief was filed through the Electronic Case Filing (ECF) system on May 26, 2015, and thus copies will be sent electronically to the registered participants as identified on the Court's Notice of Electronic Filing (NEF); paper copies will be served by first-class mail, postage prepaid, to those indicated on the NEF as non-registered participants.

                      /s/ David R. Marks
                      David R. Marks


May 26, 2015

# APPENDIX

## TABLE OF CONTENTS

M.G.L. c. 140 § 129d ............................................................................................ A-1

 Print

**PART I** ADMINISTRATION OF THE GOVERNMENT
(Chapters 1 through 182)

**TITLE XX** PUBLIC SAFETY AND GOOD ORDER

**CHAPTER 140** LICENSES

**Section 129D** Surrender of firearms and ammunition to licensing authority upon denial of application for, or revocation of, identification card or license; right to transfer; sale by colonel of state police; rules and regulations

Section 129D. Upon revocation, suspension or denial of an application for a firearm identification card pursuant to the conditions of section one hundred and twenty-nine B, or of any firearms license if said firearms identification card is not then in force or of any machine gun license, the person whose application was so revoked, suspended or denied shall without delay deliver or surrender, to the licensing authority where he resides, all firearms, rifles, shotguns and machine guns and ammunition which he then possesses unless an appeal is pending. Such person, or his legal representative, shall have the right, at any time up to one year after said delivery or surrender, to transfer such firearms, rifles, shotguns and machine guns and ammunition to any licensed dealer or any other person legally permitted to purchase or take possession of such firearms, rifles, shotguns and machine guns and ammunition and upon notification in writing by the purchaser or transferee and the former owner, the licensing authority shall within ten days deliver such firearms, rifles, shotguns and machine guns and ammunition to the transferee or purchaser and due care shall be observed by the licensing authority in the receipt and holding of any such firearm, rifle, shotgun or machine gun and ammunition.

The licensing authority, after taking possession of any firearm, rifle, shotgun, machine gun or ammunition by any means, may transfer possession of such weapon for storage purposes to a federally and state licensed dealer of such weapons and ammunition who operates a bonded warehouse on the licensed premises that is equipped with a safe for the secure storage of firearms and a weapon box or similar container for the secure storage of other weapons and ammunition; provided, however, that the licensing authority shall not transfer to such dealer possession of any weapon that is or may be evidence in any current or pending criminal case concerning a violation of any general or special law, rule or regulation governing the use, possession or ownership of such weapon. Any such dealer that takes possession of a weapon under the provisions of this section shall: (i) inspect such weapon; (ii) issue to the owner a receipt indicating the make, model, caliber, serial number and condition of each weapon so received; and (iii) store and maintain all weapons so received in accordance with such regulations, rules or guidelines as the secretary of the executive office of public safety may establish under this section. The owner shall be liable to such dealer for

reasonable storage charges and may dispose of any such weapon as provided under this section by transfer to a person lawfully permitted to purchase or take possession of such weapon.

Firearms, rifles, shotguns or machine guns and ammunition not disposed of after delivery or surrender according to the provisions of this section shall be sold at public auction by the colonel of the state police to the highest bidding person legally permitted to purchase and possess said firearms, rifles, shotguns or machine guns and ammunition and the proceeds shall be remitted to the state treasurer. Any such weapon that is stored and maintained by a licensed dealer as provided under this section may be so auctioned at the direction of: (i) the licensing authority at the expiration of one year following initial surrender or delivery to such licensing authority; or (ii) the dealer then in possession, if the storage charges for such weapon have been in arrears for 90 days; provided, however, that in either case, title shall pass to the licensed dealer for the purpose of transferring ownership to the auctioneer; and provided further, that in either case, after deduction and payment for storage charges and all necessary costs associated with such surrender and transfer, all surplus proceeds, if any, shall be immediately returned to the owner of such weapon.

The secretary of the executive office of public safety may make and promulgate such rules and regulations as are necessary to carry out the provisions of this section.