No. 14-2249

In the United States Court of
Appeals for the First Circuit

RUSSELL JARVIS; JAMES JARVIS; ROBERT CRAMPTON; AND
COMMONWEALTH SECOND AMENDMENT, INC.,

*Plaintiffs-Appellants,*

*v.*

VILLAGE GUN SHOP, INC. D/B/A VILLAGE VAULT,

*Defendant-Appellee.*

Appeal from a Decision of the United States District Court for the
District of Massachusetts, District Court No. 1:12-cv-40032

**APPELLANTS' REPLY**

Patrick M. Groulx
Grollman, LLP
321 Columbus Avenue
Boston, Massachusetts 02116
(617) 859-8966 tel
(617) 859-8903 fax
*patrick@grollmanllp.com*

David D. Jensen
DAVID JENSEN PLLC
111 John Street, Suite 420
New York, New York 10038
(212) 380-6615 tel
(917) 591-1318 fax
*david@djensenpllc.com*

# TABLE OF CONTENTS

SUMMARY OF REPLY ......................................................................1

REPLY ........................................................................................3

I.  DEFENDANT DEPRIVED PLAINTIFFS OF ADDITIONAL  PROPERTY RIGHTS
    WHEN IT IMPOSED FEES AND LIENS AND THEN TOOK TITLE ....................3

    A. Plaintiffs Continued to Hold Property Rights after Turning Over
       Custody to the Police ......................................................3

    B. Money and Title are Traditional Forms of Property,
       Not "New Property" ........................................................4

II. STATE ACTION FACILITATED THE INJURIES DEFENDANT CAUSED .........6

    A. Fair Attribution Requires a Fact-Specific Assessment of a "Host"
       of Factors ................................................................7

    B. Analogous Cases Compel the Conclusion of State Action ............9

       1.  Towing and Storage of Vehicles Following Police Seizure......9

       2.  Creditor's Remedies and Voluntary Contracts.................13

       3.  Commitment at a Private Hospital ..........................14

       4.  Termination of Employment ................................16

III.PLAINTIFFS WERE KNOWN AND DUE PROCESS ACCORDINGLY REQUIRED
    ACTUAL NOTICE, NOT CONSTRUCTIVE NOTICE ................................17

    A. Plaintiffs were Reasonably Identifiable, so Due Process Required
       Specific Notice to Them ...................................................17

    B. This is Not About Generally Applicable, Self-Executing Legislation..........18

    C. There is No Due Process Exception for Guns ..............................20

IV. COMMON LAW REMEDIES DO NOT SATISFY DUE PROCESS ................25

    A. Parratt-Hudson Applies Only to Deprivations that State Law Does
       Not Authorize .............................................................26

    B. Relief is Not Available Under State Law ......................................29

CONCLUSION ................................................................................30

# TABLE OF AUTHORITIES

## CASES

Addante v. Village of Elmwood Park, 541 F. Supp. 497 (N.D. Ill. 1982) ..............16

Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40 (1999) ........................................6

Blum v. Yaretsky, 457 U.S. 991 (1982) ........................................................... 9, 15

Board of Regents v. Roth, 408 U.S. 564 (1972)........................................................5

Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,
   531 U.S. 288 (2001)................................................................................ 6-9, 15

Brown v. Muhlenberg Twp., 269 F.3d 205 (3d Cir. 2001).......................................30

Chmielinski v. Mass. Office of the Comm'r of Probation, 513 F.3d 309
   (1st Cir. 2008) ....................................................................................................27

Clukey v. Camden, 717 F.3d 52 (1st Cir. 2013)........................................................5

Coleman v. Turpen, 697 F.2d 1341 (10th Cir. 1982) ........................................ 10-11

Commonwealth v. Reyes, 982 N.E.2d 504, 464 Mass. 245 (2013) .................. 21-22

Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1
   (1st Cir. 2005) ............................................................................................. 14-15

Flagg Bros. v. Brooks, 436 U.S. 149 (1978) .........................................................13

Goichman v. Rheuban Motors, Inc., 682 F.2d 1320 (9th Cir. 1982)............... 10, 12

González-Maldonado v. MMM Healthcare, Inc., 693 F.3d 244
   (1st Cir. 2012) ....................................................................................................8

Grapentine v. Pawtucket Credit Union, 755 F.3d 29 (1st Cir. 2014) .....................14

Gun Owners' Action League, Inc. v. Swift, 284 F.3d 198 (1st Cir. 2002) ....... 22-23

Henderson v. United States, no. 13-1487, 2015 U.S. LEXIS 3199
   (May 18, 2015)................................................................................................. 3-4

Hightower v. Boston, 693 F.3d 61 (1st Cir. 2012) .................................................24

Hudson v. Palmer, 468 U.S. 517 (1984).......................................................... 26-30

ICG Petroleum, Inc. v. U.S. Dep't of Energy, 883 F.2d 80
   (Temp. Emg'y Ct. App. 1989)............................................................................23

Jones v. Flowers, 547 U.S. 220 (2006)..................................................................18

Lipman v. Massachusetts, 475 F.2d 565 (1st Cir. 1973) .........................................6

Logiodice v. Trs. of Me. Cent. Inst., 296 F.3d 22 (1st Cir. 2002)...........................8

Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982) ................................................8

Mead v. Independence Ass'n, 684 F.3d 226 (1st Cir. 2012) ..................................16

Mennonite Bd. of Missions v. Adams, 462 U.S. 791 (1983) ..................................18

Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306 (1950)..........................18

O'Neill v. Baker, 210 F.3d 41 (1st Cir. 2000) .......................................................28

Opinion of the Justices to the House of Representatives, 536 N.E.2d 203,
    408 Mass. 1215 (1990) ................................................................. 18, 20

Parratt v. Taylor, 451 U.S. 527 (1981) ............................................................ 26-29

Pascoag Reservoir & Dam, LLC v. Rhode Island, 337 F.3d 87
    (1st Cir. 2003) ................................................................................28

Penney v. First Nat'l Bank of Boston, 433 N.E.2d 901,
    385 Mass. 715 (1982) ......................................................................14

Row v. Home Sav. Bank, 29 N.E.2d 552, 306 Mass. 522 (1940) ..........................30

San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá,
    650 F.3d 826 (1st Cir. 2011)......................................................... 27, 28

Schneider v. Cal. Dept. of Corrections, 151 F.3d 1194 (9th Cir. 1998)...................5

Smith v. Insley's Inc., 499 F.3d 875 (8th 2007) ............................................... 10-11

Spinelli v. City of New York, 579 F.3d 160 (2d Cir. 2009)............................... 23-24

Stypmann v. City & County of San Francisco, 557 F.2d 1338
    (9th Cir. 1977).................................................................. 10, 12-13, 25

Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725 (1997) ............................29

Texaco, Inc. v. Short, 454 U.S. 516 (1982) ............................................ 18, 20, 23

United States v. DeBartolo, 482 F.2d 312 (1st Cir. 1973)......................................21

United States v. Locke, 471 U.S. 84 (1985) ..................................................... 18-20

Washlefske v. Winston, 234 F.3d 179 (4th Cir. 2000) .............................................5

Zinermon v. Burch, 494 U.S. 113 (1990) ..................................................... 28-29

**STATUTES**

M.G.L. c. 140, § 129D ............................................................ 11, 18-19, 30

M.G.L. c. 140, § 131P ............................................................................22

## SUMMARY OF REPLY

The only reason that Defendant was able to impose fees and liens, and to ultimately take title to the Plaintiffs' property, was that police had seized that property and were under a legal obligation to hold it. Defendant's unilateral contract terms – the deprivations in this case – resulted because the police had taken custody of the Plaintiffs' property. This coercive action is what enabled Defendant to take custody, without authority from the Plaintiffs, and to then dictate the rates and other terms that would apply.

Defendant's claim that it is not liable hangs largely on its assertion that it did not impose any deprivation that the police had not already imposed. But this is not the case, for the police could not charge fees or impose liens, nor could they sell the guns for their own benefit. These deprivations could only occur after police chose to transfer custody to Defendant, and Defendant then chose to take those actions. And by all indications, Defendant was quite willing to do so. There is no dispute that, by the time each of the Plaintiffs received their first notice of Defendant's involvement, the fees needed to transfer the property away from Defendant's custody was half (or more) of the amount that Defendant realized when it auctioned the items. Defendant, a licensed gun dealer, was able to add guns to its inventory by doing nothing more than picking them up from the police and sending a few notices to their owners.

Defendant is liable as a state actor because the deprivations result from the police action of seizing the guns and the resulting police obligation to store them. Defendant would never have been able to impose its unilateral terms if police had not taken the guns and then had a legal obligation to hold them. Defendant's attempts to analogize to cases concerning creditor's remedies is misplaced, for in those cases the aggrieved individuals had voluntarily chosen to make their contracts. Here, Defendant imposed its contract on the Plaintiffs – and it did so precisely because the Plaintiffs were in no position to contract for themselves, owing to the police action.

The remaining defenses of Defendant and the Commonwealth are meritless. No self-executing legislation compelled Defendant to impose its fees and terms. Rather, Defendant chose the fees and other terms on its own, just at it chose to relieve the police of their storage obligations. Furthermore, the (theoretical) availability of a state-court action for conversion is also no defense. This case concerns actions that state law expressly authorizes, not random and unauthorized acts that could not be predicted.

**REPLY**

## I. DEFENDANT DEPRIVED PLAINTIFFS OF ADDITIONAL PROPERTY RIGHTS WHEN IT IMPOSED FEES AND LIENS AND THEN TOOK TITLE

While police had already taken custody of the Plaintiffs' guns and other property, Plaintiffs showed in their opening brief that Defendant deprived them of additional property interests: fees (obligations to pay money); liens (clouds on title to secure the fees); and ultimate title (sale at auction). See Plfs. Br. pp. 12-13, 20-22. Defendant and the Commonwealth do not respond directly to this point, but they characterize various issues in a manner that presumes that only *one* interest was at stake – the right of immediate possession. For example, Defendant argues that it did not cause any deprivations because "seizures of the weapons, not their ultimate disposition, implicate plaintiffs' due process rights." Deft. Br. p. 11. Both Defendant and the Commonwealth follow this premise to conclude that because state law provides for notice and a hearing in connection with the loss of a firearms license, adequate procedural protections have been provided. See id.; Com. Br. pp. 10-11.

### A. *Plaintiffs Continued to Hold Property Rights after Turning Over Custody to the Police*

Since Plaintiffs filed their brief, the Supreme Court decided Henderson v. United States, no. 13-1487, 2015 U.S. LEXIS 3199 (May 18, 2015), which addresses whether a criminal defendant who turns over guns to the government as a condition of pretrial release, and who then becomes unable to "possess" them due

to conviction, can still have them transferred to a third party and sold for his benefit.  Id. at *4.  The Court unanimously ruled that he could, explaining that while federal law made his "possession" unlawful, this was only "a single incident of ownership" that did not affect "the right merely to sell or otherwise dispose of that item."  Id. at *7, 10.  This only bolsters the showing Plaintiffs already made: that they continued to hold property interests in their guns and other property after the police took custody of them.  See Plfs. Br. pp. 12-13, 20-22.  The loss of a gun license and the concomitant loss of the right to "possess" a gun under state law does not result in the loss of remaining property interests.

B. *Money and Title are Traditional Forms of Property, Not "New Property"*

Rather than directly disputing that money and title to chattels are "property" that the Due Process Clause protects, the Commonwealth tries to re-frame the issue by characterizing the interest at stake as a purported right to "indefinite, cost-free maintenance of seized firearms in the hands of the police."  Com. Br. p. 16.  The Commonwealth then proceeds to trash the straw man argument of whether state law creates a "legitimate claim of entitlement" in this free storage service.  See Com. Br. pp. 16-18.  This misguided argument is too clever by half.

The premise to Defendant's argument is (as explained in one of the two cases that the Commonwealth cites) the expansion of "the property interests protected by procedural due process [to] extend *well beyond* actual ownership of

real estate, chattels, or money," <u>Board of Regents v. Roth</u>, 408 U.S. 564, 571-72 (1972) (emphasis added), and to also include governmental benefits for which a person has "a legitimate claim of entitlement," <u>id.</u> at 577. This "new property" includes things like welfare benefits and the continuation of tenured or contracted employment. See <u>id.</u> at 576-77. Indeed, <u>Roth</u> concerned the rights of a non-tenured professor, <u>see id.</u> at 566, and the other case the Commonwealth cites concerned a former employee's rights under a collective bargaining agreement. See <u>id.</u> at 566; <u>Clukey v. Camden</u>, 717 F.3d 52, 56 (1st Cir. 2013).

Here, notwithstanding the Commonwealth's characterization, Plaintiffs do not claim the loss of a state-law created right to indefinite, cost-free storage at the hands of police.[1] Rather, Plaintiffs claims grow from their ownership of chattels and money – which are traditional property interests, not government benefits or other types of "new property" to which the Commonwealth's citations would apply. See <u>Schneider v. Cal. Dept. of Corrections</u>, 151 F.3d 1194, 1200 (9th Cir. 1998) (<u>Roth</u>'s "recognition . . . that state law may affirmatively *create* constitutionally protected "new property" interests in no way implies that a State may by statute or regulation *roll back* or *eliminate* traditional 'old property' rights" (emphases in source)); <u>see also Washlefske v. Winston</u>, 234 F.3d 179, 185 (4th Cir. 2000) (inmates have no right to their wages "under traditional rules of

---

[1] Other issues aside, it is unclear how Plaintiffs could assert such a claim against Defendant – who is not the police.

-5-

property law" and so a "property" interest will only exist if created by statute);

Lipman v. Massachusetts, 475 F.2d 565, 568 n.7 (1st Cir. 1973) (written notes and copyright "are clearly traditional property interests," but claimed right grounded in "custom" required resort to Roth's "legitimate claim of entitlement" standard). Plaintiffs seek redress for deprivations of money and chattels, which are traditional forms of property, not a statutorily created "new property" right.

## II.  STATE ACTION FACILITATED THE INJURIES DEFENDANT CAUSED

Plaintiffs showed in their moving brief that the fair attribution issue "begins by identifying the specific conduct of which the plaintiff complains" and then examining whether that specific conduct "may be fairly attributable to the State." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 51 (1999) (quotation omitted); see Plfs. Br. pp. 12-13.  The conduct at issue here is Defendant's unilateral imposition of fees and liens, which Defendant was only able to impose because police agencies had taken custody of the Plaintiffs' property.  See Plfs. Br. p. 13.

Plaintiffs further showed that fair attribution is a "normative judgment" that considers a "host of factors," none of which applies "across the board." Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295-96 (2001); see Plfs. Br. p. 14.  For the conduct at issue here, Defendant is a state actor because:

- The deprivations that Defendant imposed resulted from the state's exercise of coercive power. If police had not taken custody of the Plaintiffs' property, then Defendant would not have been in a position that allowed it to unilaterally impose fees and liens on the Plaintiffs. Plfs. Br. pp. 14-15.

- Defendant was performing duties that would have otherwise been the obligation of the police – who are quintessential state actors. The respective police agencies had an affirmative state-law obligation to hold Plaintiffs' property for a full year, without charge, and it was Defendant's act of taking custody that relieved the police of this obligation. Plfs. Br. p. 15.

A. *Fair Attribution Requires a Fact-Specific Assessment of a "Host" of Factors*

Defendant and the Commonwealth respond by advocating an analysis that considers a limited number of individual factors in isolation. First, both argue that "gun storage" is not a traditional public function, although no one denies that law enforcement is. See Deft. Br. p. 7; Com. Br. pp. 24-25. Next, both emphasize that Defendant "was not compelled by the state to store the weapons[ or] to charge for storage or to sell them for non-payment," although no one disputes that Defendant would not have been able to do this had police not seized Plaintiffs' property in the first place. See Deft Br. p. 8; Com. Br. p. 25. Finally, both assert that Defendant "did not participate in the seizure of the guns" (which is true) and "did not store the guns for the police" (which is not, as the police are the only ones who benefit from Defendant taking custody). Deft. Br. p. 10; see also Com. Br. p. 25.

But the question of fair attribution is not so mechanically constricted. Again, Brentwood Academy, one of the Court's mre recent fair attribution

decisions, explains that "a host of facts . . . can bear on the fairness of such an attribution" – and it provides *seven* "examples" of factors that have been pertinent in prior decisions.  See Brentwood Acad., 531 U.S. at 296.  However, "no one fact" is "a necessary condition across the board," and no "set of circumstances [is] absolutely sufficient."  Id. at 295-96; see also González-Maldonado v. MMM Healthcare, Inc., 693 F.3d 244, 247 (1st Cir. 2012) (three-part present in some First Circuit decisions describes "categories," but "the conditions delineated in a number of Supreme Court decisions over many years are not easily reduced to a single formula"); Logiodice v. Trs. of Me. Cent. Inst., 296 F.3d 22, 28-29 (1st Cir. 2002) ("the reality is that some of the cases applying the state action label do not fit well into any established exception but are closer to ad hoc normative judgments").

Indeed, the Court in Brentwood Academy found state action, and while that case concerned different facts and circumstances than those presented here, what is significant is that the Court found state action because of "the pervasive entwinement of public institutions and public officials in [the organization's] composition and workings."  Id. at 298.  This conclusion did not fit neatly within any particular state action precedent, but instead reflected "the 'necessarily fact-bound inquiry'" that the "normative judgment" of fair attribution entails.  See id. at 298 (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 939 (1982)); see also id.

at 305 (Thomas, J., dissenting) ("We have never found state action based upon mere 'entwinement.'").

Defendant quotes the factors that the Court articulated in <u>Brentwood Academy</u> and then summarily concludes that "[n]one of those elements are present here." <u>See</u> Deft. Br. p. 8. But at least two of these <u>Brentwood</u> factors *are* present here. First, Defendant's deprivations "result[] from the State's exercise of coercive power," <u>Brentwood Acad.</u>, 531 U.S. at 296 (quoting <u>Blum v. Yaretsky</u>, 457 U.S. 991, 1004 (1982)), because it was the police who seized the guns and thereby incurred an obligation to store them. Furthermore, "the State provide[d] significant encouragement, either overt or covert," <u>id.</u> (quoting <u>Blum</u>, 457 U.S. at 1004), because it was the police who enlisted Defendant's services to discharge this storage obligation.

B. *Analogous Cases Compel the Conclusion of State Action*

Another lesson from <u>Brentwood Academy</u> is that in light of the "variety" of factors that can be pertinent to fair attribution, "examples may be the best teachers." <u>Brentwood Acad.</u>, 531 U.S. at 296. Fair attribution is an area where analogies are particularly telling. <u>See</u> Plfs. Br. p. 16.

1. Towing and Storage of Vehicles Following Police Seizure

The most analogous example is a private company's storage of a motor vehicle – where police seize custody of the vehicle from its owner and then turn

custody of that vehicle over to the company.  In their moving brief, Plaintiffs cited

ten decisions showing that towing and impound companies are state actors when

they perform services under these circumstances.  <u>See</u> Plfs. Br. pp. 16-19.

Defendant attempts to distinguish three of these cases, and the Commonwealth

attempts to distinguish an additional one, but these attempts fail.  <u>See</u> Deft. Br. pp.

9-10; Com. Br. p. 26.

     First and foremost, the fact that the companies in <u>Smith v. Insley's Inc.</u>, 499

F.3d 875 (8th 2007), <u>Stypmann v. San Francisco</u>, 557 F.2d 1338 (9th Cir. 1977),

and <u>Goichman v. Rheuban Motors, Inc.</u>, 682 F.2d 1320 (9th Cir. 1982), performed

services at the "behest," "request," or "instruct[ion]" of police is most certainly *not*

a ground for distinguishing the circumstances presented here.  <u>See</u> Deft. Br. p. 9;

Com. Br. p. 26.  Here, there is no dispute that Defendant also took custody of the

Plaintiffs' property because the police, having taken custody of it themselves,

asked Defendant to do so.  <u>See</u> App. 50-51, 109.  This is also true of Defendant's

attempt to distinguish <u>Coleman v. Turpen</u>, 697 F.2d 1341 (10th Cir. 1982), on the

ground that the towing company there had acted "jointly" with the police.  <u>See</u>

Deft. Br. p. 10 (quoting <u>Coleman</u>, 697 F.2d at 1345).  The basis for the court's

finding of state action was that the tower had "jointly participated in seizing the

truck by towing it away," <u>Coleman</u>, 697 F.2d at 1345, after the police had "hired"

it to do so, <u>id.</u> at 1343. This is basically what the police did here: they hired Defendant to remove and hold the property they had seized.

Furthermore, the fact that the defendant companies in some of these cases would not release property without authorization from the police[2] is also no basis for distinguishing the circumstances presented here. <u>See</u> Deft. Br. pp. 9-10; Com. Br. p. 26. Rather, this same factor is present here: when Plaintiff Russell Jarvis asked Defendant to release the property directly to him, Defendant checked first with the Massachusetts State Police office that had taken custody of the Jarvises' property for permission. <u>See</u> Doc. No. 68, ¶ 12, in <u>Jarvis v. Village Gun Shop, Inc.</u>, no. 1:12-cv-40032 (D. Mass. Sept. 9, 2014) (pointing to Defendant's business records, which show that this occurred).

Setting this aside, state law prohibited Defendant from transferring the property except "to a person lawfully permitted to purchase or take possession of such weapon" – which is virtually the same obligation as the police themselves had to allow transfers only "to any licensed dealer or other person legally permitted to purchase or take possession." <u>See</u> M.G.L. c. 140, § 129D. Thus, the Defendant here was bound not to release the property until the state's interest in licensure had been satisfied – and accordingly Defendant was serving the same public interest as

---

[2] The garage in <u>Smith v. Insley's</u> refused to release the truck without authorization from the sheriff, and in <u>Coleman</u>, "the State ha[d] asserted a right to maintain possession of the camper" as part of a criminal investigation. <u>See</u> <u>Smith</u>, 499 F.3d at 881; <u>Coleman</u>, 697 F.2d at 1345.

the police. Indeed, the Commonwealth concedes that Defendant's actions served "the general governmental interest in keeping guns out of the hands of unlicensed individuals." Com. Br. p. 26. And while the Commonwealth then tries to follow this concession with the assertion that Defendant was otherwise acting "for the owner's benefit," it never explains how, nor is any explanation apparent. See id. Rather, the only reason that police had taken custody of the Plaintiffs' property was to enforce the state's interest in keeping guns out of unlicensed hands, and it was this same state interest that bound Defendant to withhold the Plaintiffs' property from them. What changed when Defendant took custody wasn't this obligation – it was that Defendant imposed fees and liens, and ultimately took title to the property, actions that plainly did not serve the Plaintiffs' interests.

The Commonwealth's claim that Goichman's finding of state action turned in part on the fact that "the car is stored and kept as security for payment of the parking violations and overdue fines owed to the government agency" is wrong. See Com. Br. p. 26. Rather, the court in Goichman found state action on the basis of its prior decision in Stypmann. See Goichman, 682 F.3d at 1322. The court's state action analysis did not address the collection of fines, but rather, if focused on the fact that the company's services were "pursuant to a statutory scheme designed solely to accomplish the state's purpose of enforcing its traffic laws." Id. Nor was the collection of fines a basis for the finding of state action in Stypmann. There,

the court focused on the fact that it is a police officer who initiates the seizure, "summons the towing company," "designates the garage to which the vehicle will be towed," and that "[t]he towing company [then] detains the vehicle and asserts the lien for towing and storage charges pursuant to a statutory scheme designed solely to accomplish the state's purpose of enforcing its traffic laws." Stypmann, 557 F.2d at 1341-42. There, as here, the storage company's services result from the police act of seizing the property and holding it to effectuate a regulatory scheme. The storage company's deprivations would not occur but for this animating state purpose.

### 2. Creditor's Remedies and Voluntary Contracts

Defendant's reliance on Flagg Bros. v. Brooks, 436 U.S. 149 (1978), is misplaced – it rests on Defendant's incorrect claim that in Flagg the property had been "put in storage by a city official." Deft. Br. p. 7. But see Com. Br. p. 25 (correctly characterizing Flagg as being about "creditor's self-help remedies, authorized by statute"). Rather, while the city marshal who evicted the plaintiff in Flagg had "arranged for [her] possessions to be stored by" the defendant warehouse, there was a crucial distinction: there, the plaintiff had been "informed of the cost of moving and storage, *and she instructed the workmen to proceed*[.]" Flagg, 436 U.S. at 153 (emphasis added). Here, in contrast, Plaintiffs were not informed of Defendant's fees, nor did they instruct Defendant to proceed. Rather,

Plaintiffs found out about Defendant and its fees only after Defendant had already imposed them.

Other decisions that Defendant (pp. 7-8) and the Commonwealth (pp. 25-27) rely upon are likewise inapplicable. Penney v. First Nat'l Bank of Boston, 433 N.E.2d 901, 385 Mass. 715 (1982), concerned "self-help repossession" under Article 9 of the UCC – under a contract that the plaintiff had voluntarily chosen to make. See id. at 904, 385 Mass. at 720. And Grapentine v. Pawtucket Credit Union, 755 F.3d 29 (1st Cir. 2014), similarly concerned contracts providing for non-judicial foreclosure – but again, there was no dispute that the relationship was the product of a voluntary contract. See id. at 30. The court's ruling was that "the fact that Rhode Island law permits a private mortgage contract to incorporate a non-judicial power of sale, without more, does not implicate state action." Id. at 32 n.1.

### 3. Commitment at a Private Hospital

Defendant and the Commonwealth also attempt to analogize to Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1 (1st Cir. 2005), where a private hospital was not a state actor when it confined the plaintiff pursuant to an involuntary commitment order that the plaintiff's son had obtained. See id. at 3. In this decision, the court followed the "assumption" of the district court and the parties and considered three factors – "state compulsion," "nexus/joint action," and

"public function" – sequentially and in isolation.  See id. at 5-8.  But see *supra* II(A).  There was no state compulsion because the state had not "coerced or encouraged" the defendants to pursue commitment – after all, it was the son who had sought the order.  See Estades-Negroni, 412 F.3d at 5-6.  And the "nexus/joint action test" did not apply because, among other things, the state had not been "involved in the initial decision to pursue involuntary commitment, or in later decisions concerning the treatment[.]"  Id. at 6.  Finally, neither involuntary commitment nor the provision of medical or psychiatric services were traditionally "the exclusive province of the state."  Id. at 8.

The circumstances here are different because it was police agencies that made the decision to seize Plaintiffs' guns and other property, and it was these same police agencies that then made the decision to request Defendant's services.  Neither the Plaintiffs nor anyone claiming to be their guardians asked Defendant to do this.  Rather, Defendant's deprivations were put in motion because of the police and their concerns.  And while it is certainly true that police did not *force* Defendant to impose deprivations on the Plaintiffs, these deprivations still "*result*[*ed*] *from* the State's exercise of 'coercive power.'"  Brentwood Acad., 531 U.S. at 296 (quoting Blum, 457 U.S. at, 1004) (emphasis added).  Defendant would not have been able to unilaterally impose its contract terms if the police had not taken custody of the Plaintiffs' property in the first place.  See Addante v. Village

of Elmwood Park, 541 F. Supp. 497, 498 (N.D. Ill. 1982) ("No one forces the tower to accept the economic benefits the Ordinance makes available to it. It could simply refuse to tow a vehicle if due process has not been accorded the owner.").

### 4. Termination of Employment

Finally, cases such as Mead v. Independence Ass'n, 684 F.3d 226 (1st Cir. 2012), which address whether employers are state actors, also address a set of circumstances that is not particularly analogous to the circumstances presented here. See Deft. Br. p. 8; Com. Br. pp. 26-27. In any event, the analysis in Mead was confined to the issue of whether the state had compelled the plaintiff's termination, see Mead, 684 F.3d at 231, a question the court answered in the negative. There, on the basis of an inspection, a state agency had directed a private nursing home company "to replace [the plaintiff] as [a facility's] administrator." Id. at 230. However, the agency did not direct the company to fire the plaintiff, who "could have continued to work in some capacity at [the facility], as well as remained in her position as the administrator of [the company's] fourteen other assisted living facilities." Id. at 232. Rather, the company had made the decision to terminate on its own, on the basis of its own investigation that raised some additional and independent issues. See id. at 230, 232. Given that the sole ground argued for state action was state compulsion, comparisons to the present matter are not particularly instructive. Again, it is certainly true that police did not force

Defendant to impose fees and liens, but it was police action – forced on the Plaintiffs – that enabled the Defendant, working in cooperation with the police, to do so.

### III.  PLAINTIFFS WERE KNOWN AND DUE PROCESS ACCORDINGLY REQUIRED ACTUAL NOTICE, NOT CONSTRUCTIVE NOTICE

Neither Defendant nor anyone else provided Plaintiffs with actual notice that Defendant was going to impose fees and liens, nor were Plaintiffs provided an opportunity to be heard on the deprivations that Defendant effected before those deprivations became final.  <u>See</u> Plfs. Br. pp. 6-8, 22-24.  Defendant and the Commonwealth do not dispute this, but instead argue that due process did not require an attempt to provide actual notice – that is, that constructive notice via the publication of statutes was sufficient.  <u>See</u> Deft. Br. p. 12; Com. Br. pp. 11, 18-21. Preliminarily, it should be noted that this reasoning would undermine a raft of procedural due process authorities – for in most all of these cases, it was a published statute or ordinance that a court held unconstitutional.  It is little surprise that the argument lacks support.

#### A. *Plaintiffs were Reasonably Identifiable, so Due Process Required Specific Notice to Them*

Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford

them an opportunity to present their objections." Jones v. Flowers, 547 U.S. 220, 226 (2006) (quoting Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314 (1950)). A notice is not constitutionally sufficient unless it is "reasonably calculated to reach the intended recipient when sent." Id. When the name and address of a property owner are "reasonably identifiable," due process demands a notice directed to that individual at his or her address – "constructive notice alone does not satisfy the mandate of Mullane." Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 798 (1983). Indeed, in Jones v. Flowers the Court concluded that a state needed to take further steps to contact a delinquent property owner when its certified letter providing notice of an impending tax sale was returned undelivered. See Jones, 547 U.S. at 230 ("Deciding to take no further action is not what someone 'desirous of actually informing' Jones would do; such a person would take further reasonable steps if any were available.").

The names and addresses of the Plaintiffs were known, and thus, due process demanded notice directed specifically to them.

B. *This is Not About Generally Applicable, Self-Executing Legislation*

Defendant and the Commonwealth rely on United States v. Locke, 471 U.S. 84 (1985), Texaco, Inc. v. Short, 454 U.S. 516 (1982), and Opinion of the Justices to the House of Representatives, 536 N.E.2d 203, 408 Mass. 1215 (1990), to argue that there is no failure of procedural due process because § 129D provided the

Plaintiffs with constructive notice that Defendant might charge them fees and take their property. See Deft. Br. p. 12; Com. Br. pp. 18-19. But these authorities all addressed legislation of general applicability that effected changes by their terms, without further administration. These authorities are inapplicable here because § 129D did not require police to transfer the guns to Defendant, nor did it require Defendant to impose fees and liens, dictate the amount of the fees, or mandate the terms of Defendant's unilateral contract.

In Locke, a federal law required owners of mining claims to register their claims annually and provided that claims would be lost if not registered by a deadline. See Locke, 471 U.S. at 88-89. The Court found, first, that the statute operated to "automatically" forfeit a claim once the deadline had passed, rather than to create a presumption that the owner had intended to forfeit the claim. See id. at 103 ("Much of the District Court's constitutional discussion necessarily falls with our conclusion that § 314(c) automatically deems forfeited those claims for which the required filings are not timely made."). The Court contrasted prior decisions that had concerned laws that did not "conclusively" provide for forfeiture on the occurrence of a condition, but that had instead relied on the condition to create a presumption that some other fact existed – and which therefore required due process protections. See id. Because the issue in Locke was simply "altering substantive rights through enactment of rules of general applicability," Congress

had provided all the process that was due when it had enacted and published the law.  See id. at 108.

The decisions in Texaco and Opinion of the Justices stand for the same proposition.  The Court in Texaco addressed a state law that provided that mineral rights would lapse if their owners did not either use them or file a statement claiming them by a deadline.  See Texaco, 454 U.S. at 518-19.  The Court rejected the claim that individual notice was required and explained it was "essential to recognize the difference between the self-executing feature of the statute and a subsequent judicial determination that a particular lapse did in fact occur."  Id. at 533.  And in Opinion of the Justices, the Supreme Judicial Court of Massachusetts concluded that a law that shortened the time for redeeming defective titles likewise did not require individualized due process protections.  See Opinion of the Justices, 563 N.E.2d at 208-09, 408 Mass. at 1223.  As in Texaco, "the statute stated a general rule of law, self-executing in nature."  Id. at 207, 408 Mass. at 1220.  The court distinguished the circumstance in which an official's action was still needed to effect the deprivation, such as where county officials needed to bring judicial proceedings in order to quiet a title.  See id. at 207, 408 Mass. at 1220-21.

### C. There is No Due Process Exception for Guns

The Commonwealth argues that specific notice was not required because "a heightened presumption of notice attaches to the plaintiffs' status as firearms

owners and persons licensed to carry firearms under a comprehensive licensing and regulatory scheme." Com. Br. p. 19; see also Deft. Br. p. 12. Of course, automobiles are also subject to a comprehensive licensing and regulatory scheme – and yet, state actors still must provide procedural protections when they deprive individuals of property interests in them. Not surprisingly, the authorities that the Commonwealth and Defendant cite do not support their claim that presumed notice satisfies the requirements of procedural due process.

First, United States v. DeBartolo, 482 F.2d 312 (1st Cir. 1973), was a criminal prosecution for transferring a sawed-off shotgun. The court's ruling – that a criminal defendant's claimed ignorance of the unlawful nature of the firearm was not a defense from a criminal prosecution, see id. at 316-17 – is apples and oranges with the Due Process Clause's requirement of notice calculated to apprise of a contemplated deprivation of property. And Commonwealth v. Reyes, 982 N.E.2d 504, 464 Mass. 245 (2013), was also a criminal prosecution, rather than an individualized deprivation of property. The court's ruling was that, in the course of interpreting a statutory reference to a "locked container," it was appropriate to consider state and federal regulations that addressed the storage of firearms since individuals seeking gun licenses were required to complete training that covered "(a) the safe use, handling and storage of firearms; (b) methods for securing and childproofing firearms; (c) applicable laws relating to the possession,

transportation and storage of firearms; and (d) knowledge of the operation, potential dangers and basic competency in the ownership and usage of firearms." Id. at 511, 464 Mass. at 252-53 (quoting M.G.L. c. 140, § 131P(b)).  The court's statement that it could "presume that gun owners are familiar with" storage methods thus took place in a much different context.

Finally, Gun Owners' Action League, Inc. v. Swift, 284 F.3d 198 (1st Cir. 2002), also did not address the requirements of procedural due process.  The issue there was a 1998 amendment to Massachusetts law that required owners of certain "large capacity" firearms to obtain a particular type of license.  See id. at 200-01. Significantly, Massachusetts law already required gun owners to hold licenses, and this 1998 legislation had merely created an additional (third) class of license that additionally covered what the legislature had defined as "large capacity" guns.  See id. at 200.  The plaintiffs contended that the "large capacity" definition was vague and that they accordingly could not comply with the law and avoid the risk of prosecution.  See id. at 207.  The court rejected this argument because the amendment did not ban "large capacity" firearms, but instead imposed a licensing requirement – meaning that the plaintiffs could "resolv[e] uncertainty about the scope of the regulation" and avoid the risk of prosecution by obtaining the requisite license.  See id.  The quoted statement – that "all owners of firearms are on notice that they are subject to regulation, including licensing" was the court's response to

the plaintiffs' argument that they did not know whether they needed to obtain the license.  See id.  None of these decisions addressed the requirements of procedural due process, and none of them announced a rule of law that would undercut the basic procedural due process requirements of notice and an opportunity to be heard.[3]

Rather than creating a special exception for firearms, courts have applied the same procedural due process standards that apply to other deprivations of protected interests.  For example, in Spinelli v. City of New York, 579 F.3d 160 (2d Cir. 2009), police officials suspended the plaintiff's gun dealer license and took custody of her inventory of firearms.  See id. at 164-65.  The court found that security breaches at the gun store were the type of exigent circumstances that justified not providing pre-deprivation remedies – but that the city still needed to provide adequate post-deprivation remedies, which it had failed to do.  See id. at 170-71.  The city did not provide adequate notice because its letters provided only

---

[3] Also irrelevant is ICG Petroleum, Inc. v. U.S. Dep't of Energy, 883 F.2d 80 (Temp. Emg'y Ct. App. 1989), which did not concern guns, and for that matter, did not concern the due process requirements that apply when governmental actions single out individuals.  Instead, the case concerned two oil companies that had missed a statute of limitation for seeking judicial review.  See id. at 81.  These companies made the "due process" argument, rejected by the court, that Congress should have provided more than 90 days before the law shortening the period became effective.  See id. at 82.  Contrary to the Commonwealth's claim (p. 20), the actual merits of the case did not turn on the fact that there was a "highly regulated industry," but instead, on the fact that the law at issue was one of general applicability for which "a legislature need do nothing more than enact and publish the law."  See id. (quoting Texaco, 454 U.S. at 532).

a "cursory" explanation of the alleged violations, and the city had not provided an adequate opportunity to be heard because an administrative hearing would only be available after police completed their investigation, which could takes "months" or "years." See id. at 171-73. And while storage fees and liens were not at issue in that case – for there the police held the guns themselves and then returned them to the plaintiff before the start of the case – it is significant that the Second Circuit recognized that the plaintiff had separate property interests in both her license and the seized firearms. See id. at 171.

Similarly, in Hightower v. Boston, 693 F.3d 61 (1st Cir. 2012), this Court also applied traditional procedural due process protections to the deprivation at issue there: the loss of a license to carry a gun. See id. at 83-84. And while "concerns as to public health and safety" justified revoking the license without pre-deprivation protections, due process still required adequate post-deprivation protections. See id. at 85-86. The licensing law provided an adequate post-deprivation right to be heard because it expressly authorized an aggrieved individual to file a petition for a judicial hearing and empowered the judge to grant relief. See id. at 86.

Defendant and the Commonwealth make much of the fact that this Court upheld the license revocation procedures in Hightower, but they ignore that this case concerns different interests than did those cases: fees and liens imposed after

police have already seized custody of the guns, vis-à-vis the initial decision to revoke a license and seize guns. And while exigent circumstances may justify seizing guns without pre-deprivation notice, these exigencies have disappeared by the time Defendant takes custody of the guns from the police department. See Stypmann v. City & County of San Francisco, 557 F.2d 1338, 1342 (9th Cir. 1977) (after initial police seizure of vehicle is complete, "[t]he occasion for possible application of the 'extraordinary situations' test has passed"). In any event, the courts in both of these cases applied established procedural due process principles to address property deprivations that concerned the subject matter of firearms – which is fatal to the claim that some sort of special exception applies when the subject matter is guns.

## IV.    COMMON LAW REMEDIES DO NOT SATISFY DUE PROCESS

Defendant's final argument is that the availability of a state-law cause of action for conversion satisfies the requirements of procedural due process. See Deft. Br. pp. 12-14. This argument fails because this case does not concern Defendant's *unauthorized* actions. Rather, § 129D expressly authorized Defendant to impose fees and liens and to then take Plaintiffs' property. Because this case concerns deprivations that state law authorized Defendant to impose, the Parratt-Hudson line of authority is inapplicable.

A. *Parratt*-*Hudson* *Applies Only to Deprivations that State Law Does Not Authorize*

In Parratt v. Taylor, 451 U.S. 527 (1981), a prison inmate alleged that prison officials had "negligently" lost a shipment of hobby supplies that he had ordered. Id. at 529. In concluding that there was no failure of due process, the Supreme Court distinguished prior cases in which "the deprivation of property was pursuant to some established state procedure and 'process' could be offered before any actual deprivation took place." Id. at 537. Impracticality dominated in the case of "a random and unauthorized act by a state employee" because a state could not "predict" that such a loss was going to occur and provide a hearing in advance. See id. at 541. Three years later, in Hudson v. Palmer, 468 U.S. 517 (1984), the Court extended this reasoning to a guard who "intentionally" destroyed a prisoner's property. See id. at 520. The Court explained that the essential "rationale" of Parratt was that "when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur." Id. at 533. Thus, "[f]or intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy." Id.

Defendant relies on this line of authority in an attempt to justify the far broader proposition that a state-law cause of action for conversion satisfies the

requirements of procedural due process always and everywhere – without regard to the fact that state law authorizes the deprivations.  <u>See</u> Deft. Br. p. 13.  But this is not what <u>Parratt</u> and <u>Hudson</u> say – as both the foregoing discussion indicates, and as this Court has itself expressly held.

For example, in <u>Chmielinski v. Mass. Office of the Comm'r of Probation</u>, 513 F.3d 309 (1st Cir. 2008), this Court ruled that <u>Parratt</u>-<u>Hudson</u> did not apply to a procedural due process claim that concerned the adequacy of hearing procedures provided to employees of a corrections department.  <u>See id.</u> at 315.  This Court explained that "[t]he <u>Parratt</u>-<u>Hudson</u> doctrine exists to protect states from needlessly defending the adequacy of state law process when the alleged due process violation results from a deviation from that process."  <u>Id.</u>  Because state law authorized the hearing, albeit without any procedures, the conduct at issue "was not random and unauthorized."  <u>Id.</u>  Likewise, in <u>San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá</u>, 650 F.3d 826 (1st Cir. 2011), this Court similarly ruled that the <u>Parratt</u>-<u>Hudson</u> doctrine applies only to situations in which "the very nature of the deprivation made predeprivation process impossible."  <u>Id.</u> at 837 (quoting <u>Hudson</u>, 468 U.S. at 137 (internal quotation omitted)).  Even though the plaintiff in that case alleged that the defendant had failed to follow procedural requirements contained in Puerto Rico law (regarding suspension of building permits), the case still concerned "authorized" state action because Puerto Rico law

had "delegated . . . the power and authority to effect the very deprivation complained of" to the defendant. Id. at 837-38 (quoting Zinermon v. Burch, 494 U.S. 113, 138 (1990)).

The two appellate decisions that Defendant relies on to justify its expansion of the Parratt-Hudson doctrine (p. 13) do not support Defendant's position. First, the decision in O'Neill v. Baker, 210 F.3d 41 (1st Cir. 2000), concerned the adequacy of termination procedures for public employees, and this Court found that the procedures – which provided for a hearing, for procedures both before and after the hearing, and for review in either state court or pursuant to a collective bargaining agreement – satisfied due process requirements. See id. at 48-49. This Court then reasoned that "if there was a lack of adequate notice, and we have held that there was not, it would at most amount to a random and unauthorized act" because "state law clearly does provide for adequate notice" and there was no evidence showing the adoption of some other policy or practice. Id. at 50. Nor does this Court's decision in Pascoag Reservoir & Dam, LLC v. Rhode Island, 337 F.3d 87 (1st Cir. 2003), provide any support to Defendant, as the decision did not concern procedural due process, and indeed, it does not even contain the phrase "due process." Rather, there the plaintiff asserted that a governmental claim of adverse possession was a "taking." See id. at 89. The statement apparently cited by Defendant – that a *takings* claim is not ripe until the plaintiff has exhausted all

available state relief – is unique to Takings Clause jurisprudence.  See, e.g., Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 734 (1997).  This is apples and oranges from the procedural due process deficiency before this Court, as the other case Defendant cites itself recognizes.  See O'Neill, 210 F.3d at 50 ("it is well to remember that the Parratt-Hudson doctrine is directed only to claims that due process was denied and not to other kinds of constitutional violations").

Defendant's claim that these two decisions stand for the much broader proposition that "[w]here plaintiffs have adequate state remedies available to them they may not avail themselves of a federal remedy" (p. 13) is unfounded and untenable.  Quite to the contrary, "overlapping state remedies are generally irrelevant to the question of the existence of a cause of action under § 1983." Zinermon, 494 U.S. at 124.  Defendant's proposed expansion of Parratt-Hudson to also cover deprivations that the law expressly authorizes would turn decades of due process jurisprudence on its head and result in the exception swallowing the rule.

B. *Relief is Not Available Under State Law*

Finally, while the Parratt-Hudson doctrine does not apply by its terms, it must be noted that, contrary to the claims of Defendant (pp. 12-13) and the Commonwealth (p. 26 n.7), it does not appear that a Massachusetts state court would allow an action for conversion.  In Hudson, the Court only found a conversion remedy adequate because Virginia law would in fact sustain a claim

concerning a prison guard's intentional destruction of property, notwithstanding defenses such as sovereign immunity. See Hudson, 468 U.S. at 534-35; see also Brown v. Muhlenberg Twp., 269 F.3d 205, 214 (3d Cir. 2001). Here, while Defendant and the Commonwealth cite authorities that state the basic elements of conversion under Massachusetts law, they ignore that conversion liability attaches only to one who exercises dominion or control without "a legal right." See Row v. Home Sav. Bank, 29 N.E.2d 552, 553, 306 Mass. 522, 525 (1940). Here, § 129D expressly provided that Defendant could charge fees and sell stored property, so from the perspective of state law, it appears Defendant had a "legal right" to do so. None of the cases cited by Defendant and the Commonwealth address this issue.

## CONCLUSION

Defendant deprived Plaintiffs of property interests when it imposed fees and liens and then took title to their property – acts it chose to undertook when police made the opportunity available. Defendant is liable as a state actor because police actions were the necessary predicate to the deprivations it imposed, and because police requested Defendant's services in order to avoid the obligation they otherwise had. No exigency justified imposing the fees and liens without any advance notice, and in any event, there was no opportunity for a hearing before the deprivations became final. Plaintiffs established partial summary judgment.

Dated:        June 9, 2015

Patrick M. Groulx
Grollman, LLP
321 Columbus Avenue
Boston, Massachusetts 02116
(617) 859-8966 tel
(617) 859-8903 fax
*patrick@grollmanllp.com*

David D. Jensen
DAVID JENSEN PLLC
111 John Street, Suite 420
New York, New York 10038
(212) 380-6615 tel
(917) 591-1318 fax
*david@djensenpllc.com*

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 7,405 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B).

2.      This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type.

Dated:      June 9, 2015

 s/ David D. Jensen
David D. Jensen
Attorney for Plaintiffs-Appellants

On 9 June 2015 I served the foregoing brief by electronically filing it with

the Court's CM/ECF system, which generates a Notice of Filing and effects service

upon counsel for all parties in the case:

        Mark I. Zarrow, Esq.
        Lian, Zarrow, Eynon & Spofford
        mzarrow@lianzarrow.com

        David M. Marks, Esq.
        Office of the Massachusetts Attorney General
        David.Marks@state.ma.us

I affirm the foregoing statement under penalty of perjury under the laws of
the United States of America.


Dated:      June 9, 2015


                        s/ David D. Jensen
                        David D. Jensen
                        Attorney for Plaintiffs-Appellants