# United States Court of Appeals
## For the First Circuit

---

No. 14-2249

RUSSELL JARVIS, JAMES JARVIS, ROBERT CRAMPTON, and
COMMONWEALTH SECOND AMENDMENT, INC.,

Plaintiffs, Appellants,

v.

VILLAGE GUN SHOP, INC., D/B/A VILLAGE VAULT,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]
[Hon. Leo T. Sorokin, U.S. District Judge]

---

Before

Barron, Selya and Lipez,
Circuit Judges.

---

David D. Jensen, with whom David Jensen PLLC, Patrick M.
Groulx, and Grollman, LLP were on brief, for appellants.
Mark I. Zarrow, with whom Lian, Zarrow was on brief, for
appellee.
David R. Marks, Assistant Attorney General, with whom Maura
Healey, Attorney General, was on brief, for Commonwealth of
Massachusetts and Executive Office of Public Safety and Security,
amici curiae.

---

October 30, 2015

---

SELYA, **Circuit Judge**.  There are circumstances in which the actions of private parties become so entangled with the actions of public entities that the former may become liable as state actors under 42 U.S.C. § 1983.  But the line that separates private action from state action is sometimes difficult to plot.  This case, which involves the actions of a privately owned storage facility with respect to firearms confiscated by Massachusetts police officers, illustrates the point.

The district court, ruling at the summary judgment stage, concluded that the storage facility that was sued here was not a state actor and, accordingly, entered summary judgment in its favor.  After careful consideration, we affirm.

I.  **THE STATUTORY SCHEME**

We begin our odyssey with a sketch of the key elements of the Massachusetts statutory scheme for firearms ownership.

In Massachusetts, an individual who wishes to own or possess a firearm in his residence or place of business must obtain a Firearms Identification (FID) card.  See Mass. Gen. Laws ch. 140, §§ 129B, 129C; Com. v. Gouse, 965 N.E.2d 774, 785 n.14 (Mass. 2012).  Under certain defined circumstances, an FID card may be denied, suspended, or revoked.  See Mass. Gen. Laws ch. 140, §§ 129B, 131(d), (f), (i).  Pertinently, Massachusetts law provides that if a court issues an abuse prevention order against a person who presents "a substantial likelihood of immediate danger of

abuse," the court must order that person to surrender all of his firearms and his FID card (as well as any other firearms license). Mass. Gen. Laws ch. 209A, § 3B.  One who has surrendered his firearms pursuant to an abuse prevention order yet wishes to challenge the suspension or revocation of his FID card or license, may petition the ordering court for relief — and a hearing must be held within 10 days.  See id.

An FID card will expire if the holder does not renew it within the time fixed by law.  See Mass. Gen. Laws ch. 140, § 129B(9).  If an FID card expires, law enforcement officials are authorized to confiscate both the expired card and any firearms possessed by the former cardholder.  See id. § 129B(12).  The holder may at any time take steps to renew his card and reclaim his property.

The surrender of firearms pursuant to this statutory scheme does not terminate a gun owner's ownership rights.  After such a surrender has occurred, the gun owner may arrange for the firearms to be transferred or sold to any person with a valid FID card or other firearms license within one year after the date of surrender.  See id. § 129D.  The police cannot dispose of the confiscated firearms for one year, but they are not required to maintain custody of the firearms for that length of time.  Rather, the police "may transfer possession of such weapon[s] for storage purposes to a federally and state licensed dealer of such weapons

and ammunition who operates a bonded warehouse . . . that is equipped with a safe for the secure storage of firearms . . . ." Id. The statutory scheme therefore puts gun owners on constructive notice that if they do not take action with respect to their confiscated firearms, the police have a right to transfer those firearms for storage.[1]

Once a licensed dealer takes possession of confiscated firearms and any associated property, the dealer must inspect the firearms, furnish the owner with a detailed inventory, and store the items as specified by the statute. The gun owner becomes liable for all "reasonable storage charges," but he may at any time avoid the continuing accrual of such charges by selling or transferring the firearms to a person with a valid FID card or other firearms license. Id. If the owner does not either reclaim the confiscated firearms or arrange for a permitted transfer of them and then fails to pay the accumulated storage charges for a period of no less than 90 days, the dealer is authorized to auction the property in order to recoup its fees. See id. So, too, if one year has elapsed and the owner still has not either reclaimed

---

[1] While we need not — and do not — reach the due process issue, it is well-established that such statutory notice is sufficient to put gun owners on notice of the possibility that their guns may be transferred. See, e.g., City of W. Covina v. Perkins, 525 U.S. 234, 241 (1999); Gun Owners' Action League, Inc. v. Swift, 284 F.3d 198, 207 (1st Cir. 2002); United States v. DeBartolo, 482 F.2d 312, 316 (1st Cir. 1973).

or transferred his confiscated property, the dealer may sell the property at public auction and defray all accumulated storage charges out of the proceeds.  See id.  Any surplus proceeds will be remitted to the owner.[2]  See id.

## II.  FACTUAL BACKGROUND

With this foundation in place, we turn to the case at hand.  There are three groups of plaintiffs here: we rehearse their facts and circumstances separately.

### A.  James and Russell Jarvis.

Plaintiff James Jarvis is a gun owner residing in Cheshire, Massachusetts.  In the early morning hours of July 9, 2010, Massachusetts State Police troopers arrested him for domestic assault and battery.  His wife proceeded to obtain an ex parte temporary abuse protection order.  Based on this order and in pursuance of state law, see Mass. Gen. Laws ch. 209A, § 3B, the state police confiscated all firearms and ammunition found in James Jarvis's home.  The confiscated property included firearms owned by not only James Jarvis himself but also his son (James Jarvis, Jr.) and his father (Russell Jarvis).

---

[2]  A similar regime is in effect for cases in which the police choose to retain custody of the confiscated property rather than transferring it to an authorized storage facility.  See Mass. Gen. Laws ch. 140, § 129D.  If the police sell the property at public auction, the proceeds are remitted to the state treasurer.  Id.

That same morning, James Jarvis and his wife appeared in court.  A state judge extended the protection order until August 9, 2010, and it was thereafter extended to August 2, 2011.

James Jarvis moved into his parents' residence in Adams, Massachusetts, where he remained for two years.  As long as the order of protection was still velivolant, the state police could not lawfully return his firearms to him.  Moreover, his presence in his parents' home inhibited the ability of the police to return Russell Jarvis's firearms (and at any rate, Russell Jarvis did not himself possess a valid FID card or other firearms license at that time).

On August 11, 2010 — over a month after the firearms had been taken from James Jarvis's home[3] — the state police transferred custody of the confiscated firearms to defendant Village Gun Shop, Inc., doing business as "Village Vault" (the Gun Shop).  As part of its business, the Gun Shop operates a bonded warehouse for the secure storage of firearms and ammunition.  See Mass. Gen. Laws ch. 140, § 129D.  The Gun Shop inventoried the confiscated property and, in a letter to James Jarvis dated that same day, laid out its

---

[3] We note that the statute, on its face, permits an immediate transfer of property from the police to a private storage facility. Because the police waited for a month or more before transferring the weapons confiscated from the Jarvis and Crampton residences, we take no view as to how (if at all) such an immediate transfer might impact our analysis.

storage terms (including fees and costs).  The letter, to which a formal inventory was attached, explained James Jarvis's options for exercising dominion over his firearms, noting that he could "at any time transfer or sell [his] firearms to a firearms dealer or a properly licensed individual."  The inventory included Russell Jarvis's firearms; and even though the Gun Shop did not send a separate letter to Russell Jarvis, he has acknowledged that he saw the Gun Shop's letter and was generally aware that the police had transferred his property (along with his son's) to the Gun Shop.

On September 11, 2010, the Gun Shop sent James Jarvis its initial invoice.  This invoice listed out the accumulated storage charges, the administrative fee, and the handling fee. When over 9 months elapsed without payment, the Gun Shop sold the confiscated firearms and associated property at public auction.

### B.  **Robert Crampton.**

Plaintiff Robert Crampton is a gun owner domiciled in Tewksbury, Massachusetts.  In the spring of 2010, Crampton reported a burglary at his home, and the local police discovered that Crampton owned several firearms for which he did not possess a valid license.  In point of fact, Crampton's FID card had expired decades earlier.  On June 2, 2010, the police confiscated Crampton's guns and associated paraphernalia and explained to him that he needed to acquire a new FID card.

Crampton did nothing, and on November 15, 2010 — over five months after the firearms had been taken from his home — the police transferred the guns to the Gun Shop for storage. That same day, the Gun Shop wrote to Crampton, furnishing him with an inventory and delineating the sundry charges that he would be incurring. When arrearages mounted and Crampton failed to pay them for a period of more than 90 days, the Gun Shop sold his firearms at public auction.

### C.  Commonwealth Second Amendment, Inc.

Plaintiff Commonwealth Second Amendment, Inc. (CSA) is a non-profit corporation, which has a stated purpose of "education, research, publishing and legal action focusing on the constitutional right to privately own and possess firearms." CSA asserts that it "expends significant resources assisting those people whose firearms are held by bonded warehouses under the authority of [Massachusetts law]." It does not allege that any firearms owned by it have been either confiscated or auctioned.

### III.  TRAVEL OF THE CASE

In 2012, James Jarvis, Russell Jarvis, Robert Crampton, and CSA brought suit in the United States District Court for the District of Massachusetts against the Gun Shop and Mary E. Heffernan, in her official capacity as Secretary of the Executive Office of Public Safety and Security. The plaintiffs sought relief under 42 U.S.C. § 1983, maintaining that they had been deprived of

- 8 -

their Fourteenth Amendment right to due process.  Specifically, they alleged that they were forced to pay storage charges and were permanently deprived of their property (the firearms) without proper notice and opportunity to be heard.  Both the Gun Shop and Heffernan denied any constitutional breach.

In due course, the plaintiffs moved for partial summary judgment against the Gun Shop.  They sought a ruling that the Gun Shop was a state actor, which could be held liable for damages under section 1983.  The district court demurred, concluding that the Gun Shop was not a state actor for purposes of a section 1983 action.  See Jarvis v. Village Gun Shop, 53 F. Supp. 3d 426, 437 (D. Mass. 2014).  Accordingly, the court denied the plaintiffs' motion for partial summary judgment and granted summary judgment on the state action issue to the Gun Shop.  See id.; see also Fed. R. Civ. P. 56(f)(1).

Following some procedural wrangling — including the dismissal of the plaintiffs' claims against Heffernan — the district court entered a final judgment in favor of the Gun Shop. This timely appeal ensued.[4]

---

[4] Since CSA owned no guns and suffered no loss of any property, its case was dead on arrival.  See, e.g., Grajales v. P.R. Ports Auth., 682 F.3d 40, 46 (1st Cir. 2012) (explaining that an essential element of a section 1983 claim is that the plaintiff demonstrate some deprivation of rights guaranteed by the Constitution or laws of the United States).  In this court, CSA makes no reasoned attempt to challenge the judgment against it.

## IV.  THE MERITS

We divide our discussion of the merits into two segments. We begin with the standards applicable to appellate review of summary judgments and the essential elements of the section 1983 framework.  We then examine the theories of state action undergirding the plaintiffs' claim.

### A.  The Legal Landscape.

We afford plenary review to a district court's grant of summary judgment.  See Santiago v. Puerto Rico, 655 F.3d 61, 67 (1st Cir. 2011).  Where, as here, "a party moves for summary judgment and the court, sua sponte, grants judgment the other way, the usual approach to appellate oversight of Rule 56 orders must be inverted."  Quaker State Oil Ref. Corp. v. Garrity Oil Co., 884 F.2d 1510, 1513 (1st Cir. 1989).  Consequently, we view the facts and all reasonable inferences derived therefrom in the light most hospitable to the summary judgment loser (here, the plaintiffs). See id.  We will affirm the entry of summary judgment as long as the record reveals no genuine issue as to any material fact and shows that the prevailing party is entitled to judgment as a matter of law.  See Santiago, 655 F.3d at 68; Fed. R. Civ. P. 56(a).

---

Consequently, we treat that judgment as final, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that claims not developed on appeal are deemed abandoned), and our subsequent references to the plaintiffs exclude CSA unless the context indicates otherwise.

In this context, an issue is "genuine" if the record permits a rational factfinder to resolve that issue in favor of either party.  See Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010).  Within this rubric, a fact is "material" "if its existence or nonexistence has the potential to change the outcome of the suit."  Id. at 5.

Here, the correctness of the summary judgment ruling depends on the district court's application of 42 U.S.C. § 1983. In order to put this appeal in perspective, then, it is necessary to revisit the well-plowed terrain of section 1983.

"Section 1983 supplies a private right of action against a person who, under color of state law, deprives another of rights secured by the Constitution or by federal law." Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev., 421 F.3d 1, 7 (1st Cir. 2005) (quoting Evans v. Avery, 100 F.3d 1033, 1036 (1st Cir. 1996)).  A cause of action under this provision comprises two essential elements: first, the conduct complained of must have been carried out "under color of state law," and second, that conduct must have worked a deprivation of rights guaranteed by the Constitution or laws of the United States.  Grajales v. P.R. Ports Auth., 682 F.3d 40, 46 (1st Cir. 2012) (quoting Martinez v. Colon, 54 F.3d 980, 984 (1st Cir. 1995)).

In this instance, we train the lens of our inquiry on the "under color of state law" requirement (which was the lone

- 11 -

issue before the district court at summary judgment).  Because this requirement is the functional equivalent of the Fourteenth Amendment's "state action" requirement, see Perkins v. Londonderry Basketball Club, 196 F.3d 13, 17 n.1 (1st Cir. 1999), "we regard case law dealing with either of these formulations as authoritative with respect to the other, and we use the terminologies interchangeably," Santiago, 655 F.3d at 68.

### B.  **The Plaintiffs' Claim.**

The centerpiece of the plaintiffs' section 1983 claim is their allegation that they were deprived of their due process rights by the Gun Shop.  Specifically, they allege that their Fourteenth Amendment rights were abridged because they were forced to pay storage charges and, when they did not do so, their property was peremptorily sold at public auction.

It is true — if somewhat of a tautology — that the Fourteenth Amendment applies only to state action performed by "a person who may fairly be said to be a state actor."  Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982).  When the named defendant in a section 1983 case is a private party, the plaintiff must show that the defendant's conduct can be classified as state action.  See Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982).  The state action inquiry is preliminary to, and independent of, the due process inquiry.  If there is no state action, the plaintiff's claim fails.  See id.

The bar for such a showing is set quite high, and we have cautioned that "[i]t is '[o]nly in rare circumstances' that private parties can be viewed as state actors." Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 4 (1st Cir. 2005) (quoting Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir. 1992) (alterations in original). This inquiry is typically factbound. See Brentwood Acad. v. Tenn. Secondary Sch. Athl. Ass'n, 531 U.S. 288, 295-96 (2001); Burton v. Wilmington Parking Auth., 365 U.S. 715, 722 (1961) (explaining that "[o]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance").

The Supreme Court has mapped out three routes that can lead to a finding that a private party "may fairly be said to be a state actor." Lugar, 457 U.S. at 937. State action may be found if the private party "assumes a traditional public function when performing the challenged conduct," or if the private party's conduct is "coerced or significantly encouraged by the state," or if the private party and the state have become so intertwined that they were effectively "joint participant[s]" in the challenged conduct. Santiago, 655 F.3d at 68 (quoting Estades-Negroni, 412 F.3d at 5). Unless the facts of record here, viewed in the light most favorable to the plaintiffs, are capable of supporting a finding that the plaintiffs have successfully travelled one or

more of these avenues, the entry of summary judgment must stand. See id. at 69. We turn, then, to this inquiry.

    1. **Joint Action.** We start with the pathway on which the plaintiffs have placed their heaviest emphasis: joint action. To establish state action through this route, a plaintiff must show that the state has "so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity]." Santiago, 655 F.3d at 68 (quoting Estades-Negroni, 412 F.3d at 5) (alterations in original). The relevant inquiry demands a deep dive into the totality of the circumstances, with heightened attention to certain specific factors. See Perkins, 196 F.3d at 21. Those factors include whether the private party is (or is not) independent from the state in conducting its day-to-day affairs, see id.; whether the private party has shared profits generated from its challenged conduct with the state, see Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado de P.R., 84 F.3d 487, 494 (1st Cir. 1996); and whether the private party has used public facilities, see Burton, 365 U.S. at 723-24. In the case at hand, the plaintiffs do not — and cannot — come close to making the requisite showing.

    Here, the record reveals no relationship between the activities of the police and those of the Gun Shop, with one exception: a Massachusetts statute authorizes the police to

- 14 -

transfer possession of lawfully confiscated firearms and associated property to licensed storage facilities, see Mass. Gen. Laws ch. 140, § 129D, and the Gun Shop operates such a facility. Although this transfer may occur without a gun owner's express authorization, the statute puts such owners on notice that their property may be transferred if they fail to avail themselves of other options. Taken alone, that statutory authorization is too fragile a link: for purposes of demonstrating the required nexus between state action and private action, we think it insufficient simply to point to a state statute authorizing the actions of the private entity. See Jackson v. Metro. Edison Co., 419 U.S. 345, 350 (1974); Perkins, 196 F.3d at 20.

Nor can the plaintiffs bridge this gap by showing that the state acquiesced in the actions of the Gun Shop. After all, where the state "has merely announced the circumstances under which its courts will not interfere with a private sale," state action is not present. Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 164-66 (1978).

Such a tenuous connection between the state and the Gun Shop is surely not enough to ground a finding of state action — and the record discloses nothing more. For example, there is a complete dearth of evidence that the Gun Shop depends on the state in any respect for the day-to-day operation of its business. See Perkins, 196 F.3d at 21. Rather, the Gun Shop operates

- 15 -

independently in all relevant respects. Once the police transferred possession of the plaintiffs' firearms to the Gun Shop, the police ceased to have any involvement with the storage and eventual auctioning of the confiscated property: all correspondence regarding the storage charges and the sale of the confiscated property went directly between the Gun Shop and the various plaintiffs.

By the same token, there is no question but that the Gun Shop wholly owns the facility in which it operates its business. See Burton, 365 U.S. at 723-24. Nor is there anything in the record indicating that the police helped set the Gun Shop's storage charges, shared in those charges, or received any part of the auction proceeds collected by the Gun Shop. See Perkins, 196 F.3d at 21. Under the statutory scheme, the state garners proceeds from confiscated property only if the police abjure the use of a private storage facility, retain possession of the confiscated property, and the owner fails to transfer or reclaim the property within one year. See Mass. Gen. Laws ch. 140, §129D.

In an effort to forestall the conclusion that there is no joint activity sufficient to constitute state action, the plaintiffs make three arguments. These arguments are unconvincing.

First, the plaintiffs argue that the activities of the police "led to and facilitated the actions that injured" them.

This argument amounts to nothing more than an suggestion that the police are the "but-for" cause of the Gun Shop's challenged conduct: had the police not confiscated the plaintiffs' firearms, the Gun Shop would never have gained possession of the firearms and, thus, could not have imposed storage charges and sold the weapons at public auction. This argument proves too much. If but-for causation could constitute a sufficient basis for a finding of joint action, the line between state and private action would be blurred beyond recognition. Any time the state performs an action that sets in motion some subsequent action by a private party — say, issuing a driver's license — the private party could be deemed to have acted jointly with the state. So expansive a definition of "state action" would eviscerate the state action requirement.

The plaintiffs' second argument begins with the proposition that the Gun Shop "was performing duties that the police would otherwise have been obligated to perform themselves." This proposition is simply wrong. The plaintiffs rely principally on the decision in West v. Atkins, 487 U.S. 42 (1988). In that case, however, state action was found because the state had delegated an affirmative constitutional obligation to a private party by contract. See id. at 56-57. Here, unlike in West, the police had no affirmative obligation to retain possession of the plaintiffs' property. See Mass. Gen. Laws ch. 140, § 129D.

- 17 -

Rather, the statutory scheme expressly allowed the police to transfer the confiscated firearms to a licensed storage facility at any point after taking possession of them.  See id.

The plaintiffs counter, however, that even if the police were not obliged to keep their firearms, the Gun Shop "inherited" this state obligation when the police transferred the plaintiffs' firearms.  Assuming for argument's sake that such an obligation was delegated to the Gun Shop when the Gun Shop took custody of the confiscated firearms,[5] that circumstance would not avail the plaintiffs.  The statutory scheme at issue here affords gun owners ample alternatives for how to direct their confiscated property and thereby avoid unwanted storage charges.  See Mass. Gen. Laws ch. 140, § 129D; see also id. ch. 209A, § 3B.  The plaintiffs chose to eschew these alternatives, which included challenging the revocation of the FID card or firearms license, transferring the confiscated property to some person with a valid firearms license or to a licensed dealer of the owner's choice, or acquiring (or

---

[5] We note that the statutory scheme itself is less than pellucid in this regard.  On the one hand, it imposes an obligation on the police to hold confiscated firearms for up to a year.  See Mass. Gen. Laws ch. 140, § 129D.  On the other hand, if police transfer the weapons to an authorized storage facility, the statute appears to allow that facility to sell the guns after 90 days (if the storage charges go unpaid).  See id.  Here, moreover, the summary judgment record is opaque: it contains no evidence that the police purposed to delegate their state obligation to the Gun Shop.  Nor is there any evidence that the Gun Shop agreed to hold the transferred firearms for any fixed period of time.

re-acquiring) a valid firearms license in order personally to reclaim the confiscated weapons. See Mass. Gen. Laws ch. 140, § 129D; see also id. ch. 209A, § 3B. Given this range of unexercised options, we think it follows that the plaintiffs impliedly consented to the transfer of their property to the Gun Shop. Put another way, the plaintiffs' passive acquiescence in the transfer of their property sufficed to break any meaningful link between the actions of the police and those of the Gun Shop.

The plaintiffs' third argument is really a subset of their second argument. They attempt to draw sustenance from several cases in which the owner of a towing or impoundment company was found to be a state actor and, thus, potentially liable under section 1983. These cases — like West — are readily distinguishable.

In Smith v. Insley's Inc., the defendant towed and stored the plaintiff's car in connection with an ongoing murder investigation. See 499 F.3d 875, 878 (8th Cir. 2007). The defendant was therefore "performing the traditional governmental function of seizing and securing property for a criminal investigation." Id. at 880. That is not true here. In fact, had a criminal investigation been afoot, the Massachusetts statutory scheme would have required the police to retain possession of the confiscated firearms rather than transferring them to a third party

- 19 -

(such as an authorized storage facility).  See Mass. Gen. Laws ch. 140, § 129D.

In Coleman v. Turpen, 697 F.2d 1341 (10th Cir. 1982), the court found it to be of decretory significance that the private towing company had participated in the initial seizure of the affected property.  As the Tenth Circuit explained, the towing company there actually seized the plaintiff's property but also proceeded to hold the property "for the [s]tate, not for [the plaintiff]." Id. at 1345.  Here, by contrast, the Gun Shop had no involvement at all with either the police decision to confiscate the plaintiffs' property or the implementation of that decision.  And unlike in Coleman — where the towing company sold the plaintiff's property to satisfy the storage fees incurred by the police, see 697 F.2d at 1343 — the transfer of the plaintiffs' property to the Gun Shop foreclosed any possibility that the state might derive any economic benefit from that property.

To be sure, in Stypmann v. San Francisco, 557 F.2d 1338 (9th Cir. 1977) — a case factually similar to Coleman — the state would not have been able to accomplish its larger purpose of removing vehicles from roadways when their presence created a safety risk without the involvement of the towing company.  See 557 F.2d at 1340 n.2, 1341.  But that is at a considerable remove from our case, in which the summary judgment record contains nothing to suggest that the police required any assistance from

the Gun Shop in order to confiscate and store the plaintiffs' firearms. The Gun Shop simply provided the police with an alternative to storing the firearms themselves. And the plaintiffs had at least a month (and in Crampton's case over 5 months) to choose to store their confiscated property elsewhere before the police transferred the property to the Gun Shop.

That ends this aspect of the matter. After scouring the record, we conclude that there is no showing of joint action sufficient to satisfy section 1983's state action requirement.

2. **Public Function.** We turn next to the public function pathway. To navigate that route, a plaintiff must show that the private party has performed a service that, traditionally, the state has exclusively undertaken. See Santiago, 655 F.3d at 69. In this regard, we have emphasized both that "[e]xclusivity is an important qualifier" and that "the activities that have been held to fall within the state's exclusive preserve for purposes of the public function test are few and far between." Id.

This avenue does not lead to a finding of state action here. As the plaintiffs themselves have admitted, a licensed storage facility (such as the Gun Shop) exercises "statutory powers that police departments do not enjoy," notably the ability to charge storage fees. Given this admission, a finding of exclusivity is well beyond the plaintiffs' reach.

The Supreme Court's decision in Flagg Bros. is instructive on this point. There, the petitioner (a storage company) was entrusted with the respondent's goods after the respondent was evicted from her apartment. See 436 U.S. at 153. When several months passed and no storage fees were paid, the petitioner purposed to sell the goods — an action expressly authorized by state statute. See id. at 151-53. In bringing a section 1983 suit against the storage company, the petitioner alleged that the storage company had become a state actor because the state had delegated to it a power "traditionally exclusively reserved to the [s]tate." Id. at 157 (quoting Jackson, 419 U.S. at 352). The Court disagreed, concluding that the facts showed no more than a "purely private dispute" between a debtor and a creditor. Id. at 160. The respondent could resolve such a dispute, the Court said, through a raft of state-law "rights and remedies." Id. A section 1983 action was, therefore, unwarranted. See id. at 160-61.

The facts in this case are of a piece with those of Flagg Bros. The plaintiffs do not challenge here the original confiscation of their firearms by the police but, rather, challenge only the Gun Shop's storage charges and its auctioning of their confiscated property. Moreover — as we already have explained — the statutory scheme provides gun owners with a plethora of alternatives for how to direct their confiscated property and

thereby avoid unwanted storage charges.  See Mass. Gen. Laws ch. 140, § 129D; see also id. ch. 209A, § 3B.  The plaintiffs chose not to avail themselves of any of these alternatives.  Viewed in this light, the case at hand — like Flagg Bros. — adds up to nothing more than a garden-variety dispute between a debtor and a creditor.  This type of purely private dispute cannot be elevated to the level of an exclusive state concern.  See Flagg Bros., 436 U.S. at 160-61; see also Perkins, 196 F.3d at 19 (explaining that the "short list of activities" falling within the state's "exclusive preserve" includes, for example, "'the administration of elections, the operation of a company town, eminent domain, peremptory challenges in jury selection, and, in at least limited circumstances, the operation of a municipal park'") (quoting United Auto Workers v. Gaston Festivals, Inc., 43 F.3d 902, 907 (4th Cir. 1995)).

  3.  **State Compulsion.**  This leaves only the state compulsion avenue.  Traveling this route demands that an inquiring court ask whether the state has used coercive power or has provided such a substantial degree of encouragement that the private party's decision to engage in the challenged conduct should fairly be attributed to the state.  See Rendell-Baker, 457 U.S. at 840 (citing Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)).  Contrary to the plaintiffs' importunings, the facts of this case make clear that the state compulsion route is a dead end.

We can be brief.  Nothing in the Massachusetts statutory scheme either requires or compels the Gun Shop — or any other private storage company — to provide its services to the police. The opposite is true; a firearms dealer, such as the Gun Shop, must affirmatively seek a license to offer such storage services. What is more, the police are at liberty to transfer confiscated firearms to any licensed dealer who satisfies the statutory requirements.  Given that both the state and the private storage companies have unfettered freedom of choice with respect to their participation in this statutory scheme, a finding of state compulsion will not lie.  See Adickes v. S. H. Kress & Co., 398 U.S. 144, 170 (1970).

## V.  CONCLUSION

We summarize succinctly.  In their action against the Gun Shop, the plaintiffs do not challenge either the confiscation of their firearms or the police's authority to transfer those firearms to a bonded warehouse for storage.  Rather, they challenge the imposition of storage charges and the subsequent auctioning of their firearms after they failed to pay those storage charges. But the facts evidenced in the summary judgment record, even when viewed in the light most favorable to the plaintiffs, do not show that state action, as opposed to private action, produced these asserted harms.  Although the activities undertaken by the Gun Shop were authorized by state law, mere compliance with the

strictures of state law cannot transmogrify private action into state action.  Nor is it enough that the state set in motion the subsequent actions taken by the Gun Shop: but-for causation is simply insufficient to conjure a finding of state action.  Whatever rights (if any) the plaintiffs may have against the Gun Shop, they have made out none under section 1983.

We need go no further.  We have combed through the plaintiffs' arguments in support of their state action rationale and found them wanting.  It follows that the judgment of the district court must be

**Affirmed**.